ORAL ARGUMENT NOT YET SCHEDULED

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Nos.26-1168, 26-1174,
26-1188, 26-1193, 26-1202

HEATING, AIR CONDITIONING & REFRIGERATION
DISTRIBUTORS INTERNATIONAL, ET AL.,
*Petitioners*,
v.
ENVIRONMENTAL PROTECTION AGENCY *and* LEE M. ZELDIN, *in his official capacity as Administrator of the U.S. Environmental Protection Agency*,
*Respondents*.

On Petition For Review Of Agency Action By The Environmental Protection Agency, 91 Fed. Reg. 31,248 (May 26, 2026)

# MOTION TO EXPEDITE CONSIDERATION OF PETITIONS FOR REVIEW

Pursuant to Federal Rule of Appellate Procedure 27, D.C. Circuit Rule 27(e), and D.C. Circuit Handbook of Practice And Internal Procedures Part VIII.B, Petitioners The Air-Conditioning, Heating, and Refrigeration Institute ("AHRI") and The Alliance For Responsible Atmospheric Policy (the "Alliance") (collectively, "AHRI Petitioners") file this Motion To Expedite Consideration Of The Petitions For Review of Respondent the United States Environmental Protection Agency's ("EPA") final rule entitled *Phasedown of Hydrofluorocarbons: Reconsideration of Certain Regulatory Requirements Promulgated Under*

*the Technology Transitions Provisions of the American Innovation and Manufacturing Act of 2020*, 91 Fed. Reg. 31,284 (May 26, 2026) ("Rule"). Dkt.2180840 at Attachment A.[1]

AHRI Petitioners do not seek a stay of the Rule out of respect for this Court's oft repeated admonition that "[a] stay pending appeal is an 'extraordinary' remedy." *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 63 (D.C. Cir. 2024) (citation omitted). Instead, they propose only that the parties submit briefs on a timeframe approximating the timeframe provided for under Federal Rule Of Appellate Procedure 31(a)(1). AHRI Petitioners respectfully request that the Court enter the following case schedule, which would expedite this Court's consideration of these consolidated petitions:

- **Petitioners' Opening Briefs**: September 17, 2026 (up to 19,000 words split among Petitioners challenging the Rule in Nos.26-1168, 26-1174, 26-1188, and 26-1193; up to 7,000 words for Petitioners in No.26-1202);[2]

[1] Citations of "Dkt." are of this Court's docket in No.26-1174.

[2] There are five petitioner groups, each of which intends to challenge various portions of the Rule. Four of the five petitioner groups have interests that are different (representing States, environmental groups, and different industry groups), and intend to challenge some aspects of the Rule that are overlapping and some that are not, *see* Nos.26-1168, 26-1174, 26-1188, and 26-1193, but AHRI Petitioners expect that those four groups will be able to allocate a joint word group

- **EPA's Response Brief**: October 19, 2026 (up to 26,000 words);
- **Intervenors' Briefs In Support Of EPA**: October 26, 2026 (up to 13,300 words);
- **Petitioners' Reply Briefs**: November 16, 2026 (up to 9,500 words split among Petitioners challenging the Rule in Nos.26-1168, 26-1174, 26-1188, and 26-1193; up to 3,500 words for Petitioners in No.26-1202);
- **Deferred Appendix**: November 19, 2026;
- **Final Briefs**: November 24, 2026;
- **Oral Argument**: This Court's December sitting.

Counsel for AHRI Petitioners conferred with counsel for other Petitioners, Intervenors, and EPA, who indicated the parties' following positions on this Motion: Petitioners in No.26-1168 consent to this Motion; Petitioners in No.26-1188 and No.26-1193 consent to the proposed word-limits, but oppose the proposed briefing schedule and intend to file a response proposing their own briefing schedule; Petitioners in No.26-1202 and Intervenor-Respondents in No.26-1168 oppose this Motion and will submit a separate suggestion for briefing; Intervenor-Respondents Food Marketplace, Inc., American Frozen Food

among themselves. AHRI Petitioners are proposing a separate word allocation for the Petitioners in No.26-1202 because they are actively adverse to certain of the other Petitioners and have intervened to oppose certain aspects of their petitions. *See infra* p.13 n.5.

Institute, National Grocers Association, and Retail Litigation Center consent to the proposed word-limits, but oppose the proposed briefing schedule; and EPA opposes this Motion and will file a separate response.

**STATEMENT**

A. AHRI is a national trade association representing hundreds of manufacturers in the heating, ventilation, air conditioning, refrigeration, and water heating ("HVAC") industry. AHRI & the Alliance, Comment Letter on Proposed Rule, *Phasedown of Hydrofluorocarbons: Reconsideration of Certain Regulatory Requirements Promulgated Under the Technology Transitions Provisions of the American Innovation and Manufacturing Act of 2020*, 90 Fed. Reg. 47,999 (Oct. 3, 2025), Docket ID No.EPA–HQ–OAR–2025–0005, at 1 (Nov. 21, 2025) (attached hereto as "Exhibit A"). AHRI's members design, manufacture, and distribute HVAC equipment subject to EPA regulations—including, as relevant here, EPA's technology transitions requirements in 40 C.F.R. pt. 84, subpt. B. Ex.A at 1. AHRI also operates global-performance-certification programs and collaborates with regulators like EPA to ensure performance efficiency. *Id.* The Alliance is a coalition of fluorocarbon producers, users, and trade associations that advocates for ozone

protection and climate policy, seeking to ensure cost-effective and environmentally sound regulations for the fluorocarbon industry under the Clean Air Act—which EPA administers—and the Montreal Protocol. *Id.* at 1–2. The HVAC industry generates over $200 billion in annual economic activity in North America, and AHRI Petitioners' members employ hundreds of thousands of people in the United States alone, giving them a direct, substantial interest in ensuring that, when EPA promulgates rules impacting the HVAC industry, those rules are lawful and practicable for the industry to comply with. *Id.* at 2.

Over the past four decades, manufacturers have successfully executed multiple transitions to new refrigerant technologies according to predictable schedules under the Montreal Protocol and Title VI of the Clean Air Act. *Id.* at 6. Executing such a transition entails significant investments, as HVAC manufacturers must retool factories, certify new products, train technicians, and sequence commercialization. *Id.* at 2, 5–6. Further, such transitions require certainty and predictability for the HVAC industry and its American consumers, given that reliable heating and cooling equipment are essential to our Nation's critical infrastructure and overall economic success. *Id.* at 5–6.

B. In 2020, Congress enacted the American Innovation and Manufacturing Act ("the Act"), 42 U.S.C. § 7675, the statute EPA relied upon for the Rule.

The Act phases down the production and consumption of hydrofluorocarbon refrigerants by constraining their aggregate supply and creating a cap on consumption, which will gradually decline from 2025 to 2036. *See* Ex.A at 7–8. This "phase-down" structure promotes "certainty for manufacturers and consumers and an orderly and predictable transition to next-generation technologies" that are "more environmentally friendly." *Promoting American Innovation and Jobs: Legislation to Phase Down Hydrofluorocarbons: Hearing on H.R. 5544 Before the Subcomm. on Env't & Climate Change of the H. Comm. on Energy & Com.*, 116th Cong. 2 (2020) (hereinafter "*Hearing on H.R. 5544*"); *see also, e.g.*, *id.* at 7–8; *id.* at 39–40, 44–46, 48; *id.* at 60–61.[3] The Act sets 2029 for the cap on total hydrofluorocarbon consumption to be 30 percent of original baseline consumption. *See* Ex.A at 7–8.

[3] Available at https://www.congress.gov/event/116th-congress/house-event/LC68818/text?hl=s%2C2754&s=3&r=4 (all websites last accessed Aug. 18, 2026).

The Act also authorizes EPA to regulate use of hydrofluorocarbon refrigerants in sectors of the HVAC industry. *See* 42 U.S.C. § 7675(e). Specifically, the Act directs EPA to phase down the production and consumption of hydrofluorocarbons, *id.* § 7675(e)(3)(A), and authorizes it to "fully, partially, or on a graduated scale" restrict the use of hydrofluorocarbons in subsectors of the industry, *id.* § 7675(i). This allows EPA regulations to reduce the industry's use of hydrofluorocarbon refrigerants as the Act's cap on total hydrofluorocarbon consumption decreases, thus keeping the industry's demand for hydrofluorocarbons in line with the Act's ever-decreasing supply cap. *See* Ex.A at 7–8. The Act directs EPA when promulgating such regulations to consider the best available data, the availability of substitutes, overall economic costs and environmental impacts, and the remaining phasedown period. 42 U.S.C. § 7675(i)(4)(A)–(D).

The Act mandates a one-year-delay period between promulgation and the effective date for any EPA regulation that restricts the use of a regulated substance like hydrofluorocarbons. *Id.* §§ 7675(i)(1), 7675(i)(6). Specifically, the one-year-delay provision provides that no rules that "restrict, fully, partially, or on a graduated schedule, the use of a

regulated substance," *id.* § 7675(i)(1), "may take effect before the date that is 1 year after the date on which the Administrator promulgates the [ ] rule," *id.* § 7675(i)(6). This is longer than the default 30-day effective date for rules under the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(d), and it is consistent with the Act's phase-down structure and goal of providing regulatory certainty to manufacturers and consumers by ensuring that EPA cannot alter transition dates or levels without adequate notice, *supra* pp.5–7.

In October 2023, EPA promulgated a rule under the Act known as the "Technology Transitions Rule," restricting the use of certain hydrofluorocarbon-based equipment in several sectors, including the HVAC industry, based on the "global-warming potential" of each particular hydrofluorocarbon refrigerant being used. *See* 88 Fed. Reg. 73,098, 73,149 (Oct. 24, 2023) ("2023 Rule"). The 2023 Rule prohibited importing, manufacturing, or installing certain air-conditioning equipment, heat-pump equipment, and refrigeration equipment used in cold storage warehouses that used hydrofluorocarbons with a global-warming potential at or above 150 or 300 units. *See id.* at 73,149, 73,162. The 2023 rule set various compliance deadlines for different industry

subsectors, including: January 1, 2025, for residential and light commercial HVAC systems; January 1, 2026, for retail food remote condensing units and cold storage warehouses; and January 1, 2027, for supermarkets. *Id.* at 73,150, 73,162, 73,178. It also established a system for the orderly transition in refrigerant technology as the Act's 2029 hydrofluorocarbon supply reduction approaches. *See* Ex.A at 4–12.

The 2023 Rule's dates and thresholds align with those advocated for by HVAC industry participants, including AHRI Petitioners. *See id.* at 2. In reliance on these dates and thresholds, industry members have significantly invested in retooling plants, qualifying new product lines, and training workforces preparing to come into compliance by the 2023 Rule's deadlines. *See id.* at 2, 4–7. Further, since 2020, the industry has experienced significant domestic growth while organizing an orderly transition to the next generation of refrigerant technologies under the Act and the 2023 Rule, without disrupting manufacturing or capital investments, or unnecessarily raising consumer prices. *See id.* at 6–7.

In December 2023, a group of petitioners challenged the 2023 Rule in this Court. *Food Marketplace, Inc. v. EPA*, No.23-1347 (D.C. Cir. Dec. 26, 2023). After the new Administration took office in 2025, EPA filed an

unopposed motion to hold the case in abeyance, which this Court granted. *Food Marketplace, Inc.*, No.23-1347, Dkts. 2099636, 2102542. Several petitioners then requested that EPA reconsider the 2023 Rule to extend its compliance deadlines, arguing that they were unachievable and costly. *See* EPA, Petitions for Reconsideration and Judicial Review Under the AIM Act.[4]

In 2025, EPA proposed revisions to the 2023 Rule's global-warming potential limits and transition dates that would become the Rule at issue here. 90 Fed. Reg. 47,999 (Oct. 3, 2025). Specifically, EPA proposed to delay the transition dates and instate interim global-warming potential limits for three commercial refrigeration sectors: supermarket systems, retail food remote condensing units, and cold storage warehouses. *See* Ex.A at 7. EPA proposed that these revisions become effective within 30 days of promulgation. *See* 90 Fed. Reg. at 48,014. AHRI Petitioners submitted comments opposing the proposed sector-wide delays for the supermarket and retail food remote condensing unit sectors. *See* Ex.A. As they explained, delaying the 2023 Rule's transition dates or raising

[4] Available at https://www.epa.gov/hfcs/petitions-reconsideration-and-judicial-review-under-aim-act.

its interim global-warming potential thresholds "would undermine production schedules, require dual inventories, and misalign demand with a tightening national supply cap," resulting in supply chain disruptions and higher costs for businesses and individual consumers. *Id.* at 2. They also submitted evidence showing that the HVAC industry is fully capable of meeting the 2023 Rule's transition dates, that the proposed revisions would misalign supply and demand, that changing requirements now would disregard the substantial investments industry had already made in reliance on the 2023 Rule's framework, and that the revisions would impose significant costs ultimately passed onto consumers. *See* Ex.A. Finally, AHRI Petitioners argued that the Act required a one-year delay for the proposed revisions. *Id.* at 30–31.

On May 26, 2026, EPA finalized and published the Rule. 91 Fed. Reg. 31,284. The Rule increases the 2023 Rule's limitations and transition dates by allowing supermarkets and retail food remote condensing units to use hydrofluorocarbon refrigerants with a global-warming potential up to 1,400 and cold storage warehouses to use refrigerants with a global-warming potential up to 700 until January 1, 2032, when the 2023 Rule's 300 and 150 respective limits will begin

applying again. *See id.* at 31,286, 31,330. The Rule also removes the January 1, 2026, installation deadline for residential and light commercial air-conditioning and heat-pump systems assembled from specified components manufactured or imported before January 1, 2025. *See id.* The Rule provides that it "is effective on July 27, 2026." *Id.* at 31,284; *see id.* at 31,300 (attempting to distinguish the Act's one-year-delay provision).

On June 25, 2026, AHRI Petitioners filed their Petition challenging the Rule in this Court under the APA. AHRI Petitioners challenge only those portions of the Rule amending 40 C.F.R. § 84.54(c)(11), addressing remote condensing unit systems; amending 40 C.F.R. § 84.54(c)(12), addressing supermarket systems; and implementing a 60-day effective date for those amendments. *See* Dkt.2180840. Several other industry members and affected entities have also filed petitions challenging the same and/or other portions of the Rule in this Court. *See* No.26-1168, Dkt.2180473; No.26-1188, Dkt.2184066; No.26-1193, Dkt.2184683; No.26-1202, Dkt.2185122.[5] This Court consolidated these cases. *See*

[5] Petitioners in No.26-1202 challenge only aspects of the portion of the Rule that addresses cold storage warehouse systems, which the AHRI Petitioners do not challenge here. *See* No.26-1202, Dkt.2185122 at 2.

Dkt.2185214. This Court then granted EPA's request for additional time to file the certified index to the administrative record, Dkt.2186939, which EPA filed today, Dkt.2188769.

## LEGAL STANDARD

This Court may "expedite the consideration of any action" whenever "good cause therefor is shown." 28 U.S.C. § 1657(a). Section 1657 provides that "'good cause' is shown if" a constitutional or statutory right "would be maintained in a factual context that indicates that a request for expedited consideration has merit." *Id.* Expedition is appropriate where the movant demonstrates that "delay will cause irreparable injury and that the decision under review is subject to substantial challenge." D.C. Circuit Handbook of Practice and Internal Procedures Part VIII.B (Dec. 4, 2025) ("Handbook").[6] Expedition is also appropriate where "the

Other Petitioners have challenged different aspects of the cold storage warehouse provisions. Petitioners in No.26-1202 have successfully intervened to oppose those challenges, making clear that they oppose *any* attempt—from EPA or any Petitioners—to "restrict the use of refrigerants in the cold storage subsector." Dkt.2183668 at 10. Thus, Petitioners in No.26-1202 are adverse to EPA in No.26-1202 and also adverse to certain other Petitioners who challenge different aspects of the cold storage warehouse provisions. *Id.* at 10–12.

[6] Available at https://www.cadc.uscourts.gov/sites/cadc/files/rules-Handbook20251204.pdf.

public" or "persons not before the Court, have an unusual interest in prompt disposition." *Id.*

## ARGUMENT

### I. AHRI Petitioners Will Suffer Irreparable Harm Absent Expedited Review

A. "[I]rreparable injury" exists where the court would otherwise be "unable to grant effective relief," including based on mootness absent prompt judicial action. *Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986); *see Ctr. For Int'l Env't L. v. Off. of U.S. Trade Rep.*, 240 F. Supp. 2d 21, 22 (D.D.C. 2003) (the "*de facto* deprivation of the basic right to appeal" constitutes a "strong showing of irreparable harm"). Separately, monetary losses with no ability to recover also constitutes "irreparable harm." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (per curiam). "[N]onrecoverable" compliance "costs" incurred because of a challenged rule constitute irreparable harm. *Ohio v. EPA*, 603 U.S. 279, 291–92 (2024) (citation omitted).

B. Here, delaying this Court's consideration of the Petitions "will cause irreparable injury" to AHRI Petitioners, satisfying this element of the good cause inquiry for two reasons. Handbook, *supra*, Part VIII.B.

*First*, absent expedition, there could be an argument that a central part of AHRI Petitioners' challenge to the Rule may "become moot" before this Court has a chance to address the Petitions on the merits. *Population Inst.*, 797 F.2d at 1081.

AHRI Petitioners intend to argue that the Rule is unlawful in part because EPA violated Section 7675(i)(6)'s one-year-delay provision. Under Section 7675(i)(6), no rules that "restrict, fully, partially, or on a graduated schedule, the use of a regulated substance," 42 U.S.C. § 7675(i)(1), "may take effect before the date that is 1 year after the date on which the Administrator promulgates the [ ] rule," *id.* § 7675(i)(6). Here, EPA "implement[ed] a 60-day effective date" for the portions of the Rule that AHRI Petitioners challenge, Dkt.2185654 at 3—rather than a one-year effective date, 42 U.S.C. § 7675(i)(6)—although the Rule "restrict[s], fully, partially, or on a graduated schedule, the use of a regulated substance," *id.* § 7675(i)(1). Specifically, EPA promulgated the Rule on May 26, 2026, stating that the Rule "is effective on July 27, 2026"—*i.e.*, 60 days from the date of publication, 91 Fed. Reg. at 31,284—rather than on May 26, 2027—*i.e.*, one year from the date of publication, per Section 7675(i)(6)'s one-year-delay provision.

In AHRI Petitioners' view, their challenge to the Rule's 60-day effective date will remain live, not moot, even after the passing of May 26, 2027—the earliest lawful effective date for the Rule under Section 7675(i)(6)'s one-year rule. That is because this Court can provide "effective relief," *Population Inst.*, 797 F.2d at 1081, against the Rule's violation of Section 7675(i)(6)'s one-year-delay provision even after May 26, 2027. The Court could vacate those portions of the Rule that AHRI Petitioners have challenged here and remand to EPA for consideration of whether to re-promulgate those portions with a one-year effective date, as Section 7675(i)(6) requires. *See Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022) ("[v]acatur is the normal remedy" against a rule promulgated with "legal error"). Alternatively, this Court could toll the effective date of those portions of the Rule that AHRI Petitioners have challenged for 10 months—*i.e.*, the one year required by Section 7675(i)(6) minus the 60 days that EPA unlawfully imposed—consistent with the evident purpose of Section 7675(i)(6) to provide regulatory certainty to manufacturers and consumers. *Supra* pp.5–8.

Nevertheless, AHRI Petitioners are extremely concerned that if this case proceeds absent expedition, this Court may conclude that AHRI

Petitioners' challenge to the Rule's 60-day effective date would become moot on May 26, 2027. Again, May 26, 2027, is the earliest lawful effective date for the Rule under Section 7675(i)(6)'s one-year-delay provision, given EPA's promulgation of the Rule on May 26, 2026. *Supra* pp.7–8, 15–16. So, under this potential mootness argument, this Court could conclude that it lacks the ability to give Petitioners any "effective relief," *Population Inst.*, 797 F.2d at 1081, once May 26, 2027 has arrived—perhaps under a theory that any violation of Section 7675(i)(6) by the Rule "was fully remedied" as of that date, *Prows v. Dep't of Just.*, 938 F.2d 274, 275–76 (D.C. Cir. 1991) (per curiam). **As a practical matter, absent expedition, there is a serious possibility that this Court would not resolve this case by May 26, 2027**.

This Court expediting this case and entering its decision by May 26, 2027, is thus the only way to ensure that AHRI Petitioners obtain effective relief on their substantial Section 7675(i)(6) one-year-delay-provision claim. AHRI Petitioners are entitled by law to bring this claim to this Court. *See, e.g.*, 42 U.S.C. § 7607(b)(1); 5 U.S.C. § 702; 42 U.S.C. § 7675(k)(1)(C). Further, this claim is important not only for the lawfulness of the portions of the Rule that AHRI Petitioners challenge

here, but also for the operation of the Act going forward. That is because the Act empowers EPA to "restrict, fully, *partially*, *or on a graduated schedule*" the use of hydrofluorocarbons. 42 U.S.C. § 7675(i) (emphasis added). So, any time EPA attempts to modify its previously imposed restrictions with a "subsequent rule[ ]" that is "less stringent" in its restrictions on the use of hydrofluorocarbons—as it did in the Rule here, 91 Fed. Reg. at 31,300—the question of whether EPA must delay the effective date of that regulation by one year under Section 7675(i)(6) will arise. Without a ruling from this Court—which AHRI Petitioners are unquestionably jurisdictionally and statutorily permitted to seek now—manufacturers and consumers will not have regulatory certainty under the Act. The Court should not let the mere happenstance of timing potentially prohibit it from granting "effective relief" to AHRI Petitioners. *Population Inst.*, 797 F.2d at 1081.

Second, and independently sufficient, the Rule became effective in July, *see* 91 Fed. Reg. at 31,284, meaning AHRI Petitioners are currently incurring "nonrecoverable" compliance "costs" to adhere to a challenged rule that they argue is invalid, *Ohio*, 603 U.S. at 291–92 (citation omitted). As AHRI Petitioners explained in their comments before EPA,

the Rule's mid-course relaxation of hydrofluorocarbon standards will impose additional costs on equipment manufacturers—especially those who, like AHRI Petitioners, invested heavily and early to bring their businesses into compliance with the Act's and 2023 Rule's requirements. *See* Ex.A at 4–5. These companies have been expending significant time and resources for years to transition to manufacturing and training personnel to use HVAC equipment that uses hydrofluorocarbons with a global-warming potential of less than 150 or 300 units by 2025, 2026, or 2027 (depending on system type and sector). *See* Ex.A at 2–6, 12, 20–21.

But now, the Rule makes AHRI Petitioners' and their members' efforts meaningless by permitting industry members to continue using equipment with much higher global-warming potential—1,400 for supermarket systems and retail food remote condensing units—until 2032. *See* 91 Fed. Reg. at 31,286, 31,330. This means that, in order to remain competitive, AHRI Petitioners and their members must create duplicative product lines and maintain dual inventories—*i.e.*, products they already invested in designing and manufacturing that comply with the 2023 Rule's requirements and restarting or increasing production of products that meet the Rule's more lax standards; must recertify models

to comply with the revised global-warming potential thresholds; and must retrain their workforces to produce, install, and use products that were phasing out. *See* Ex.A at 4–6, 12, 21. Suffering these nonrecoverable monetary losses establishes "irreparable harm" absent expedition. *Ala. Ass'n of Realtors*, 594 U.S. at 765.

## II. The Rule Is Subject To Substantial Challenge

A. A court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C); "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B); "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A); or is taken "without observance of procedure required by law," *id.* § 706(2)(D). Agency action is arbitrary and capricious where: the action "runs counter to the evidence before the agency," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); the agency "failed to consider an important aspect of the problem," *id.*; the agency failed to adequately consider costs, *see Michigan v. EPA*, 576 U.S. 743, 752–53 (2015); or where agency fails to offer an

adequate explanation for departing from its own policy, *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–16 (2009).

B. AHRI Petitioners present a "substantial challenge," Handbook, *supra*, Part VIII.B, to the Rule for multiple reasons.

*First*, as referenced above, the Rule is "not in accordance with law," 5 U.S.C. § 706(2)(A), because it violates Section 7675(i)(6)'s one-year-delay provision. Under the Act, any rule from EPA that will "restrict, fully, partially, or on a graduated schedule, the use of a regulated substance," 42 U.S.C. § 7675(i)(1), "may [not] take effect before the date that is 1 year after the date on which the Administrator promulgates the [ ] rule," *id.* § 7675(i)(6). The plain text of Section 7675(i)(6) covers *both* agency action imposing a new restriction on the use of a regulated substance, as well as agency action that relaxes—but does not remove—a prior restriction on the use of a regulated substance. *See id.* § 7675(i)(1), (6). That is because a rule that relaxes a prior restriction without eliminating it still "restrict[s]" the "use of a regulated substance," at least "partially, or on a graduated schedule." *See id.* § 7675(i)(1), (6).

This interpretation also accords with the evident regulatory-certainty purpose of Section 7675(i)(1), as with the Act as a whole. EPA's

relaxation of a prior restriction can still impose burdens on manufacturers, including because it may require them to "maintain multiple product lines" and more "complex[ ]" "supply chains, warehousing, [and] distribution networks." *Hearing on H.R. 5544* at 39–40. Thus, manufacturers would benefit from a one-year effective date in such circumstances as well. *Supra* pp.19–20. In contrast, agency action that completely *removes* a restriction on the use of a regulated substance would not fall within Section 7675(i)(6)'s scope, as that does not "restrict" the use of a regulated substance, 42 U.S.C. § 7675(i)(1), (6), and, accordingly, does not implicate the same regulatory-certainty concerns of manufacturers, *supra* pp.5–8.

Here, the Rule relaxes existing requirements for the use of hydrofluorocarbons by delaying certain compliance dates and raising interim global-warming potential limits on a sector-wide basis. *Supra* pp.10–12, 19–20. While that action does allow for more use of hydrofluorocarbons than under the prior regime, it still "restrict[s]" the "use of" those substances, *id.* § 7675(i)(1), and so may not "take effect" until "1 year after the date on which the Administrator promulgates the [ ] rule," *id.* § 7675(i)(6). Thus, by providing that the Rule will become

effective 60 days after publication, *supra* pp.15–16, EPA violated Section 7675(i)(6), rendering the Rule "not in accordance with law," 5 U.S.C. § 706(2)(A). And while EPA has taken the position that Section 7675(i)(6) applies only to the creation of new restrictions and not to, as relevant here, the relaxation of existing restrictions, that contradicts Section 7675(i)(6), and so is not the "best reading" of that provision. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

*Second*, the Rule's delay of the HVAC industry's transition to next generation refrigerant technologies is arbitrary and capricious on numerous grounds. *See* Ex.A at 4–33.

To begin, EPA failed to provide a "reasoned explanation" for "depart[ing] from" its own longstanding "prior policy" of allowing manufacturers to execute refrigerant transitions on predictable schedules established under the Montreal Protocol and Title VI of the Clean Air Act. *Fox*, 556 U.S. at 515. For 40 years, American manufacturers have executed refrigerant transitions on "predictable" timelines that allow "design, certification, supply-chain buildout, and technician training to move in step." Ex.A at 6. Yet, EPA now breaks from this longstanding practice, as the Rule changes the 2023 Rule's

compliance dates and global-warming potential thresholds in the middle of manufacturers' transition to next generation refrigerant technologies. *See* 91 Fed. Reg. at 31,286, 31,330. EPA has provided no "good reasons for" this abrupt change that disrupts "serious reliance interests" among regulated entities. *Fox*, 556 U.S. at 515.

The Rule also "runs counter to the evidence before the agency," *State Farm*, 463 U.S. at 43, because the record shows that the HVAC industry is fully capable of meeting the current dates and thresholds under the 2023 Rule, *see* Ex.A at 3, 6–7. As AHRI Petitioners explained, "the [HVAC] market has already shifted" to comply with the 2023 Rule's more stringent standards. *Id.* at 6. For example, when AHRI Petitioners submitted their comments in November 2025, nearly 90% of shipments of new residential and light commercial air-conditioning and heat-pump systems—which were subject to the 2023 Rule's January 1, 2025, transition date—were already using next generation refrigerants technologies. *Id.* at 3. EPA's June 2024 "Significant New Alternatives Policy (SNAP) rulemakings confirm[ed] that technically feasible, commercially deployable substitutes are available now for" "new

supermarket systems [and] retail food remote condensing units." *Id.* at 15.

EPA also "failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, with altering the Act's goal of aligning supply and demand by misaligning a declining supply of hydrofluorocarbons with a near-term increase in demand for those HFCs in new equipment, causing demand to exceed supply by approximately 2030—as demonstrated by EPA's own previous analysis conducted in 2023.

The Rule is also arbitrary and capricious because EPA failed to adequately consider the costs of delaying the transition dates. *See Michigan*, 576 U.S. at 752–53. Since 2020, manufacturers have invested in compliance, workforce development, and product certification in reliance on the Act's 2029 phasedown cap as implemented by the 2023 Rule. *Supra* pp.8–9. Delaying the industry's ongoing refrigerant transition now will impose significant costs on U.S. manufacturers in the form of duplicative product lines, dual inventories, re-certifications, and retraining, which costs will be passed on to American consumers. *Supra* pp.9–11. These significant costs outweigh any potential benefit from delaying the transition dates, *see Michigan*, 576 U.S. at 752–53, as EPA's

own data confirms that a delay is unnecessary for the HVAC industry to comply with the 2023 Rule, *supra* pp.24–25; Ex.A at 6–8.

These arguments raise "substantial challenge[s]" to the Rule, which is all that is necessary to establish good cause for expedition. Handbook, *supra*, Part VIII.B.

## III. The Public Has A Strong Interest In Prompt Disposition

Good cause also exists because "the public generally" and "persons not before the Court, have an unusual interest in prompt disposition" of this case. *Id.*

To begin, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters ("LWV") v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation omitted). As discussed, *supra* pp.20–25, AHRI Petitioners have raised a substantial challenge to the Rule, including because the Rule's 60-day effective date violated Section 7675(i)(6)'s one-year-delay provision. The public has a "substantial [ ] interest" in EPA "abid[ing] by" that requirement. *LWV*, 838 F.3d at 12. Absent expedition, a portion of AHRI Petitioners' challenge may become moot, *supra* pp.15–18, potentially allowing EPA to violate "the federal

laws that govern [its] existence and operations" without consequence, *LWV*, 838 F.3d at 12. At present, Petitioners unquestionably have a statutory and jurisdictional right to challenge the Rule on the basis that it violated Section 7675(i)(6)'s one-year-delay provision and addressing this challenge would give the Court an opportunity to clarify the meaning of this provision, which clarity would benefit the public. *Supra* pp.15–18, 21–23. But if this Court resolves this matter in the normal course, it may jurisdictionally lose the opportunity to address this issue on the merits and provide that public benefit. *Supra* pp.15–18. Accordingly, the public has "an unusual interest in prompt disposition" here. Handbook, *supra*, Part VIII.B.

Further, other "persons not before the Court," *id.*, including the hundreds of thousands of individuals working in the HVAC industry, also have a strong interest in expedition due to the substantial compliance costs and disruptions that the industry is subject to each day that the Rule remains effective, *supra* pp.19–20. And these costs and disruptions in the industry will ultimately be passed onto consumers in the form of increased prices. *See* Ex.A at 3–5, 7–8. This too gives the public "an

unusual interest in prompt disposition" here to minimize the extent of these price increase. Handbook, *supra*, Part VIII.B.

## CONCLUSION

This Court should grant this Motion.

Dated: August 18, 2026

Respectfully submitted,

/s/ Misha Tseytlin
MISHA TSEYTLIN
*Counsel of Record*
KEVIN M. LEROY
TROUTMAN PEPPER LOCKE LLP
225 W. Randolph St., Suite 2600
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 759-1938 (KL)
(312) 443-0336 (fax)
misha.tseytlin@troutman.com
kevin.leroy@troutman.com

*Attorneys for Petitioners the Air-Conditioning, Heating, and Refrigeration Institute and the Alliance for Responsible Atmospheric Policy*

JAMES W. BEERS, JR.
TROUTMAN PEPPER LOCKE LLP
401 9th Street, N.W., Suite 1000
Washington, DC 20004
(202) 274-1934
james.beers@troutman.com

KAITLIN L. O'DONNELL
TROUTMAN PEPPER LOCKE LLP
1313 N. Market St., Suite 1000
Wilmington, DE 19801
(302) 777-6541
kaitlin.odonnell@troutman.com

CARSON A. COX
TROUTMAN PEPPER LOCKE LLP
1001 Haxall Point, 15th Floor
Richmond, VA 23219
(804) 697-1338
carson.cox@troutman.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

This Motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because this Motion contains 5,166 words, excluding the parts of the Motion exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1) and those accompanying documents excepted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 27(d)(2).

This Motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this Motion has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: August 18, 2026

/s/ *Misha Tseytlin*
MISHA TSEYTLIN
TROUTMAN PEPPER LOCKE LLP
225 W. Randolph St., Suite 2600
Chicago, IL 60606
(608) 999-1240 (MT)
misha.tseytlin@troutman.com

## CERTIFICATE OF SERVICE

Pursuant to Rule 25(d) of the Federal Rules of Appellate Procedure, I hereby certify that, on August 18, 2026, I caused the foregoing document to be electronically filed using the Court's CM/ECF system, which automatically provides email notification of the filing to the attorneys of record in the above captioned docket.

Dated: August 18, 2026

/s/ Misha Tseytlin
MISHA TSEYTLIN
*Counsel of Record*
TROUTMAN PEPPER LOCKE LLP
225 W. Randolph St., Suite 2600
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 443-0336 (fax)
misha.tseytlin@troutman.com

*Attorney for Petitioners the Air-Conditioning, Heating, and Refrigeration Institute and the Alliance for Responsible Atmospheric Policy*

# EXHIBIT A

November 21, 2025

U.S. Environmental Protection Agency
EPA Docket Center
Air and Radiation Docket (Mail Code 28221T)
1200 Pennsylvania Avenue NW
Washington, DC 20460

**Re: Phasedown of Hydrofluorocarbons: Reconsideration of Certain Regulatory Requirements Promulgated Under the Technology Transitions Provisions of the American Innovation and Manufacturing Act of 2020; 90 Fed. Reg. 47,999 (Oct. 3, 2025); Docket ID No. EPA–HQ–OAR–2025–0005**

To Whom It May Concern:

The Air-Conditioning, Heating, and Refrigeration Institute (AHRI) and the Alliance for Responsible Atmospheric Policy (Alliance) respectfully submits these comments on the U.S. Environmental Protection Agency's (EPA) proposed rule, *Phasedown of Hydrofluorocarbons: Reconsideration of Certain Regulatory Requirements Promulgated Under the Technology Transitions Provisions of the American Innovation and Manufacturing Act of 2020*, 90 Fed. Reg. 47,999 (Oct. 3, 2025) (Proposed Rule).

AHRI represents more than 330 manufacturers in the U.S. heating, ventilation, air conditioning, refrigeration, and water heating (HVACR) industry. As the national trade association for manufacturers subject to EPA's Technology Transitions (TT Rule) requirements in 40 C.F.R. pt. 84, subpt. B, AHRI and its members are directly affected by this reconsideration, including proposed adjustments to compliance dates, global warming potential (GWP) thresholds, and provisions governing system installation and related sector requirements. *See* 88 Fed. Reg. 73098 (Oct. 24, 2023). AHRI's members design, manufacture, and distribute covered equipment used across the United States, and AHRI operates global performance certification programs and collaborates with standards bodies on performance efficiency.

The Alliance is a coalition of fluorocarbon producers, users, and trade associations that has shaped global and domestic ozone protection and climate policy since 1980. It coordinates

industry engagement to advance cost-effective, environmentally sound regulation under Title VI of the Clean Air Act and the Montreal Protocol.

In North America, the annual economic activity generated by the HVACR industry exceeds $211 billion. In the United States alone, AHRI and Alliance member companies, together with distributors, contractors, and technicians, employ more than 700,000 people. Accordingly, AHRI and the Alliance have a direct and substantial interest in this rulemaking and submits these comments to assist EPA in developing a lawful, technically sound, and practicable final rule.

## 1. EXECUTIVE SUMMARY

The TT Rule is the operating system for an orderly transition in U.S. HVACR markets as the AIM Act's next supply stepdown in 2029 approaches. It rests on a bipartisan statute signed by President Trump in 2020 and an industry-vetted sequence of dates and thresholds initially petitioned by AHRI in 2021 and finalized consistent with that petition in 2023. In reliance on that foundation, over the past half-decade manufacturers have made significant investments to retool plants, qualify new product lines, and train distribution channels and technicians.

Upending that foundation now, by delaying transition dates or raising interim GWP limits on a sector-wide basis, would undermine production schedules, require dual inventories, and misalign demand with a tightening national supply cap—***with <u>higher costs</u> for American households, businesses, contractors, grocers, and builders.***




*Source:* OTS R&D, Inc., *AIM Act Technology Transitions Refrigerant Modeling Scenarios* (Nov. 2025), Fig. 5.

Moreover, a federal rollback will not reduce the level of regulation for American manufacturers and businesses using cooling equipment. Instead, it will trigger a patchwork of rules among the states. States already regulating HFCs are positioned to go faster (and in divergent ways) if EPA steps back. Already, New York's amended Part 494, now under legal challenge by AHRI and HARDI, imposes GWP limits as low as 10 and 20 across major categories on compressed timelines that current product roadmaps cannot meet.[1] California will release a white paper early next year outlining its plans to impose GWP limits of 10 across the HVACR industry, and Washington will convene a task force to plot further HFC regulatory actions to implement before the end of the decade.

If the Proposed Rule is finalized without any changes, the 24 states and territories belonging to the U.S. Climate Alliance, representing approximately 55 percent of the U.S. population and 60 percent of GDP, can be expected to add their own disparate mandates. These state actions will multiply compliance regimes, splinter national sourcing strategies, and erode the economies of scale that keep consumer prices in check.

Moreover, the broad, sector-wide delays contained in the Proposed Rule are not supported by the record. To the contrary, there is clear evidence the U.S. HVACR market can meet the current TT Rule transition dates. Multiple substitute refrigerants are listed as approved under EPA's Significant New Alternatives Policy (SNAP) and building codes nationwide now allow for their installation. Already, by July of this year, nearly 90 percent of shipments of new residential and light commercial air conditioning and heat pump systems (which were subject to a January 1, 2025, transition date) used substitute refrigerants.

AHRI and the Alliance therefore oppose the sector-wide delays for the supermarket and retail food remote condensing unit sectors in the Proposed Rule. AHRI and the Alliance do not take a position on the proposed changes to the requirements for cold storage warehouses. However, where a discrete subsector faces a near-term constraint regarding a forthcoming transition date in 2026 or 2027 (*e.g.*, wine cellar coolers, milk coolers, or laboratory refrigeration equipment), AHRI and the Alliance would support the provision of targeted relief until January 1, 2029. Relief beyond that date, when HFC supply declines to 30 percent of baseline, risks increasing aggregate demand to a point where the market could see across the board refrigerant price increases.

The AIM Act was designed to level the playing field and channel investment into U.S. capacity and modern product platforms. Diluting federal standards now would reward laggards, often located offshore, while penalizing American firms that invested early, with higher unit costs, customer confusion, and procurement friction to follow. The practical course is clear: keep one

---

[1] *Heating Air-Conditioning Refrigeration Distributors International and The Air-Conditioning, Heating, and Refrigeration Institute v. New York State Department of Environmental Conservation, and Acting Commissioner Amanda Lefton*, Index Number 903624-25.

national schedule, preserve the 2029 supply-demand alignment, and use narrow, evidence-based relief only where necessary. That is how EPA can protect price stability, planning certainty, and the competitive position U.S. manufacturers have earned and U.S. consumers deserve.

## 2. EPA MUST MAINTAIN THE EXISTING TT SCHEDULE AND REJECT SECTOR-WIDE DELAYS AND HIGHER INTERIM GWP LIMITS

### A. The existing TT Rule aligns demand with the AIM Act phasedown and safeguards U.S. jobs and investment; EPA should preserve it without sector-wide relaxation

AHRI and the Alliance respectfully urge EPA to maintain the existing TT Rule transition dates and GWP thresholds established under the American Innovation and Manufacturing Act of 2020 (AIM Act), 42 U.S.C. § 7675. The proposal to delay transition dates and raise allowable GWP limits in several commercial refrigeration subsectors would undermine the statutory phasedown schedule, penalize U.S. manufacturers that have already invested to comply, and risk price and supply disruptions across the domestic refrigerant market. *See* Letter from Stephen R. Yurek, Pres. & CEO, AHRI, & Kevin Fay, Exec. Dir., Alliance for Responsible Atmospheric Policy, to Lee Zeldin, Adm'r, EPA (Feb. 18, 2025) (supporting AIM Act certainty and warning that partial rollbacks would expose manufacturers to costly state fragmentation and trade risks).

The AIM Act's allowance program (Subpart A) constrains aggregate supply, while the TT Rule (Subpart B) guides where and when demand will materialize so industry can prepare for an orderly, practical transition under tightening supply caps. As discussed more fully below, misaligning the two by broadly deferring sector dates shifts demand to later in the phasedown and elevates price risk across the entire U.S. economy. *See* Stephen R. Yurek & Kevin Fay, *America Built the Refrigerant Industry. We Should Own Its Future*, Nat'l Interest (Sept. 16, 2025) (explaining that regulatory certainty avoids dual inventories, redundant lines, and fractured training that raise costs).

Equipment manufacturers will face added costs from EPA's proposed mid-course relaxation. Interrupting the ongoing refrigerant transition will compel duplicative product lines, dual inventories, recertification of models, and retraining cycles—costs borne disproportionately by early-moving U.S. manufacturers while late movers and importers free-ride on sunk domestic investments.

EPA should instead preserve the current implementation framework, which has delivered measurable investment, employment, and productivity gains while ensuring an orderly and achievable transition to next generation refrigerant technologies. As detailed in the sections that follow, the existing schedule:

- Aligns supply and demand with the AIM Act's 2029 phasedown cap, avoiding refrigerant scarcity and price spikes;
- Protects U.S. manufacturing competitiveness by sustaining regulatory certainty for firms that have invested in compliance, workforce development, and product certification;
- Avoids the added costs of an interrupted transition, including duplicate SKUs, split production, dual field support, and repeat certification;
- Demonstrates technical readiness through widespread availability of compliant substitutes and nationwide code adoption; and
- Supports targeted, not broad, adjustments where discrete applications require short-term flexibility without disturbing the overall market balance.

Maintaining a stable, investment-grade framework will uphold Congress's directive to EPA under the AIM Act, protect consumers from unnecessary cost increases, and preserve U.S. leadership in the orderly transition to next generation refrigerant technologies. By contrast, relaxing dates or raising interim limits penalizes U.S. firms that retooled, certified, and stocked to meet the current TT schedule, while advantaging late-moving and foreign producers that can ship legacy models into the U.S. market.

EPA therefore should keep one predictable federal schedule so U.S. manufacturers are not undercut by laggards and imports, and so customers are not asked to pay for the regulatory uncertainty forced on the market by the proposed rule. *See* Letter from AHRI, Alliance for Responsible Atmospheric Policy, American Chemistry Council, National Association of Manufacturers, & U.S. Chamber of Commerce to Lee Zeldin, Adm'r, EPA, Industry Support for the AIM Act as a Pillar of American Manufacturing Strength 1–2 (Apr. 16, 2025) (explaining that the AIM Act's predictable phasedown enables timely investment and avoids a costly state-by-state patchwork).

### B. The AIM Act's regulatory certainty has catalyzed U.S. HVACR investment, employment, and growth since 2020; a change now risks derailing this growth

Heating and cooling equipment is a fundamental part of the nation's infrastructure, enabling safe hospitals, reliable food and medicine supply chains, productive workplaces, data center operation, and comfortable indoor conditions no matter the temperature outside. A strong domestic HVACR manufacturing base is essential to national security and resilient supply chains, supports national preparedness, and anchors skilled jobs in communities across the country. Sustaining the competitiveness of U.S. HVACR firms strengthens the industrial capacity on which health, security, and future economic growth depend.

Over the past 40 years, U.S. manufacturers have executed multiple refrigerant transitions. Each shift, from CFCs to HCFCs, then to HFCs, and now to next generation refrigerant technologies, proceeded on predictable schedules established under the Montreal Protocol, as negotiated by President Ronald Reagan, and Title VI of the Clean Air Act (42 U.S.C. §§ 7671–7671q) as signed into law by President George H.W. Bush, that allowed design, certification, supply-chain buildout, and technician training to move in step, benefiting American manufacturers and consumers alike.

Since President Trump signed the AIM Act into law in 2020, implementation has reflected domestic manufacturer priorities and provided the certainty required for investment in the U.S. economy. The statutory framework and its implementing regulations, including in particular the TT Rule, have organized the market so firms can retool factories, certify new products, train technicians, and sequence commercialization without disruption. Industry data show broad-based recovery and growth in U.S. HVACR manufacturing since 2020:

- Real shipments: $65.3 billion in 2024, up 8.7% since 2022.
- Employment: 146,300 workers in 2024, up 10% since 2020.
- Labor productivity: Up 7% in 2024, the largest annual gain since 2009.
- Total wages and pay: $10.6 billion in total wages in 2024; average annual pay of $73,000.

These gains and related domestic industrial growth rest on capital commitments undertaken in reliance on the AIM Act's clear framework and the sequencing reflected in the TT Rule. Inforum, *HVACR Manufacturing: Economic Trends and Insights* (Sept. 16, 2025) (documenting growth in shipments, employment, productivity, and wages).

Reconsidering or delaying transition dates would impose duplicative product lines, require dual inventories, and trigger recertification costs that fall most heavily on firms that invested early, while advantaging foreign competitors that did not undertake comparable investments.

Claims about substitute availability and lack of building code readiness do not withstand scrutiny. In the residential and light commercial air conditioning sector, the market has already shifted; 85 percent of equipment shipped in July 2025 (climbing to 89 percent in August 2025) use next generation refrigerant technologies, confirming supply at scale and commercial readiness. HARDI, *Unitary Market Intelligence Project* (2025). *See* HARDI, "A2L Equipment Reaches 90 Percent of Market Share as Cooling Season Ends" (Nov. 19, 2025), at https://hardinet.org/posts/press-release/a2l-equipment-reaches-90-of-market-share-as-cooling-season-ends. As discussed more fully in Section 3, updated building codes are likewise in place nationwide. Building authorities in virtually all U.S. jurisdictions have recognized A2L use through updated codes, legislation, or letters of approval; the very few remaining jurisdictions

will have updated codes in place prior to forthcoming transition dates via normal cycles. Industry training and certification programs are operating and accessible, ensuring qualified installation and service.

In short, the AIM Act's implementation has coincided with measurable domestic growth in shipments, employment, productivity, and wages, and has organized the transition to next generation refrigerant technologies without stalling investment. Preserving this stability is the condition for sustaining the industry's growth and the nation's manufacturing base.

### C. Maintaining the current TT dates best balances supply and demand under the phasedown and minimizes price risk for consumers

#### *i. Introduction*

The AIM Act guides an orderly transition to next generation refrigerants by balancing supply and demand to minimize risk of price increases and otherwise provide a certain regulatory landscape to guide investment in the U.S. economy. The Proposed Rule unbalances supply and demand, harming American manufacturers that made substantial domestic investments in reliance on the AIM Act's stable framework and very likely raising prices for American consumers.

Simply put: the upstream production and consumption phasedown, codified at 40 C.F.R. pt. 84, subpt. A, establishes a finite supply of HFCs, which declines gradually in accordance with the AIM Act's statutory schedule. The TT Rule's GWP limits on refrigerants in new equipment, codified at 40 C.F.R. pt. 84, subpt. B, establishes demand for steadily diminishing quantities of HFCs. As Subpart A reduces the production and import of older classes of refrigerants, Subpart B reduces the use of those older classes of refrigerants. This aligns supply with demand, rewarding investment by American manufacturers and minimizing price risk for American consumers.

The Proposed Rule delays the transition dates and institutes interim GWP limits for three commercial refrigeration sectors: supermarket systems, retail food remote condensing units, and cold storage warehouses. The result misaligns supply and demand and would harm every sector—including the commercial refrigeration sectors the Agency seeks to help with this action. The economics are fundamental: adjusting Subpart B to increase demand while Subpart A continues to decrease supply will result in elevated price risk and otherwise disrupt the market.

This relationship is borne out by the record EPA established in the 2023 TT rulemaking. In the *Costs and Environmental Impacts Technical Support Document*, Figure 4-1 ("Consumption Mitigation by Year") presented stacked annual avoided HFC consumption by sector in the TT base case, overlaid with reference lines for the AIM Act phasedown cap and the Allocation Rule reference case. EPA explained that the modeled abatement "overshoots (dips below) the relevant AIM Act consumption cap" from the first compliance year (2025) through 2036—demonstrating that the timing and scale of equipment restrictions were specifically designed to keep total HFC

consumption below statutory caps in every stepdown year, including the 2029 reduction to 30 percent of baseline. *See* U.S. Envtl. Prot. Agency, *Costs and Environmental Impacts Technical Support Document*, Docket EPA–HQ–OAR–2021–0643, at 35–36 & fig. 4-1 (Sept. 2023) (EPA TSD 2023).

The Proposed Rule is at odds with EPA's earlier analysis, asserting that higher near-term demand during a period of declining supply will not materially affect price because "the HFC phasedown established by Congress in the AIM Act will continue to limit the production and consumption of HFCs, with a significant stepdown in 2029," and that extending dates to 2032 "preserves optionality and flexibility" and lets "market pressure" and "the advantages of many of the new refrigerants" drive continued transition. 90 Fed. Reg. at 48,007–08.

This is internally inconsistent. EPA proposes sector-wide delays on claims that substitutes are unavailable and codes impede their use, while simultaneously asserting that "other forces will continue to encourage the ongoing transition," pointing to upstream limits and the "significant stepdown in 2029" as drivers. *Id*. at 48,007–08. The acknowledgement undercuts the predicate and reflects circular reasoning: EPA is delaying requirements because substitutes and codes are said to be inadequate, yet assumes minimal market impact because substitutes are available and adoption will proceed, all while appearing to ignore the risk of adverse price effects in 2029 and beyond from elevating demand as supply tightens under the phasedown. *Id*. EPA's own modeling in the 2023 record indicates otherwise; as noted above, it showed abatement below the cap in each step-down year when the original dates were maintained.

AHRI has commissioned its own modeling to evaluate the dynamics of HFC supply and demand in forthcoming years to assess the risk of supply shortfall leading to price increases. *See* OTS R&D, Inc., *AIM Act Technology Transitions Refrigerant Modeling Scenarios* (Nov. 2025) (OTS Analysis).

***ii. OTS Analysis Modeling Framework***

**Purpose and scope.** The OTS Analysis developed models of refrigerant supply, demand, and reclamation based largely on data developed and published by the EPA to quantify total supply and demand under the original TT Rule and the Proposed Rule and to identify any surplus or shortage of refrigerant that might bear on pricing and affordability.

**Supply definition and calibration.** In each model year, total HFC supply equals allowable consumption under the AIM Act plus reclamation plus stockpiled inventory from prior years; the model is calibrated so that end-of-year 2024 inventory matches EPA's HFC Data Hub value of 287 $MMTCO_2e$. *Id*. at 2; *see* U.S. Envtl. Prot. Agency, *Expanded HFC Data* (Sept. 15, 2025) (Expanded HFC Data). The OTS Analysis reports that reclamation has been "less than 3%" of annual consumption (2022) and that EPA "expects the reclamation market to grow exponentially… reaching 40.1 million lbm… by 2029"; OTS accepts this assumption in their

analysis but characterizes it as a best-case scenario requiring "significant changes to technician practices and major investments" to occur this decade. OTS Analysis at 2.

**Demand construction.** OTS models HFC demand from EPA's 2024 Greenhouse Gas Inventory (2022 baseline by sector), using annual growth rates from EPA vintaging-model documentation tracking installed stock and estimating servicing demand as equal to reported leaks ("emissions from stocks"). *See* OTS Analysis 2–3; U.S. Envtl. Prot. Agency, *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2022* (EPA 430-R-24-004) (2024); U.S. Envtl. Prot. Agency, *U.S. GHG Inventory 2019: Annex 3, Additional Source or Sink Categories, Part A* (2019).

**Policy scenarios and take-rate parameters**. OTS modeled the original TT Rule and the Proposed Rule, with adoption assumptions "largely aligned with EPA's assumptions of market penetration stated in the regulatory impact analysis." OTS Analysis 4. The Proposed Rule sets interim GWP limits of 1,400 for new remote condensing units starting January 1, 2026, and for new supermarket systems starting January 1, 2027, reverting to 150/300 on January 1, 2032. 90 Fed. Reg. at 48,007–08. For cold storage warehouses, EPA proposes an interim 700 GWP limit for new installations. *Id*. at 48,009. The OTS Analysis notes EPA's acknowledgment that interim uptake in supermarkets and remote condensing units could range from 0% to 92% and that EPA assumed 35.8% in its base case; OTS models 80% uptake of R-448A and R-449A for those subsectors and 80% uptake of R-513A for cold storage (vs. EPA's 5%), citing recent GreenChill data showing R-448A and R-449A shares consistently over 80%. OTS Analysis 4–5 & fig. 1; *see also* OTS Analysis 5 tbl. 2.

**Modeled outcomes.** OTS presents demand and end-of-year inventory time series for both scenarios (figs. 3–4). It states: without any reclamation, "demand for HFCs could deplete the supply by 2029"; with exponential reclamation, supply "may be stabilized… under the original… Rule," but "under the reconsidered rule… overall demand [will] outstrip supply by ~2030." OTS Analysis at 6-7. OTS further notes that EPA's own preliminary analysis indicates reduced abatement with wide uncertainty and reports its own projection of a 64.5 $MMTCO_2e$ increase in demand in 2025–2032 under the reconsideration scenario, within EPA's range. OTS Analysis at 8.




*Source:* OTS R&D, Inc., *AIM Act Technology Transitions Refrigerant Modeling Scenarios* (Nov. 2025), Fig. 5.

**Implication for EPA's assumptions.** OTS characterizes EPA's base-case interim take-rates as low relative to EPA's acknowledged uncertainty range and therefore models higher, but still within EPA's established range, uptake—yielding greater HFC demand during the deferral period. OTS Analysis 4–5. Although OTS' assumptions are within the range deemed possible by the agency, EPA's own analyses show the proposed rule leads to a significant increase in demand (62.8, but as high as 168.6 MMTCO2e through 2050).

**OTS Analysis Findings.** As illustrated below, Figure 6 of the OTS Analysis shows the modeled range of refrigerant price outcomes across the price-elasticity-of-demand (PED) values used in the analysis, comparing the current TT Rule with the Proposed Rule scenario. OTS Analysis fig. 6. Relying primarily on EPA data and working within EPA's stated ranges, the model shows pronounced price increases emerging around 2030, when, even with exponential increases in reclamation, annual demand must be repeatedly cut roughly 15–20% below what the market would otherwise require under the tightening cap. OTS emphasizes the significance of many factors that cannot be predicted with certainty and suggests there is a possibility that price increases could be dramatically higher than these projections if overall demand increases, reclamation rates lag, or price inelasticity exceeds expectations. *Id*.

The takeaway is straightforward: the Proposed Rule misaligns supply and demand and, as a result, can be expected to raise prices for American consumers.

***iii. Europe's Cautionary Example and Price Inelasticity for Refrigerant Servicing***

Europe provides a relevant benchmark corroborating this outlook. During the 2017–2018 quota steps, service company purchase prices for major high-GWP HFCs rose to roughly six to thirteen times 2014–2015 levels, with pass-through along the supply chain and documented illegal trade. *See* European Commission, *Evaluation & Impact Assessment for Amending Regulation (EU) No 517/2014 (F-gas)*, Briefing Paper 1, at 5 (May 6, 2021); Öko-Recherche & CITEPA, *Briefing Paper: HFC Availability on the EU Market* (Mar. 2020). This reflects a failure to manage demand as quota tightened. The same risk exists in the United States if policy raises new fill demand while supply declines.

Refrigerant service demand for installed systems is relatively inelastic because equipment is engineered for a specific refrigerant and substitution typically requires component replacement or system re-engineering. Under such conditions, modest supply shortfalls can yield disproportionate price effects—consistent with the OTS results showing demand exceeding available supply around 2030 under the reconsideration scenario and higher modeled prices relative to the current TT Rule. OTS Analysis at 6-7 & fig. 4 and fig. 6.

***iv. EPA Estimates for Refrigerant Recovery and Reclamation Are Not Baseline Scenarios***

Historically, HFC reclamation has been less than three percent of annual consumption. In the Proposed Rule, EPA references its Economic Analysis in the docket projecting reclamation of approximately 40.1 million pounds by 2029. 90 Fed. Reg. at 48,017 & n.90. The OTS Analysis characterizes this as a best-case assumption and explains that reaching this level would require "significant changes to technician practices and major investments." OTS Analysis at 2.

Indeed, projecting increased refrigerant recovery and reclamation in the preamble of a proposed rule does not make it so. Even assuming exponential growth of reclamation (consistent with EPA's projections used in the OTS scenarios), supply narrowly meets demand under the current TT Rule. Under the Proposed Rule, delaying transitions in supermarket systems, retail food remote condensing units, and cold storage warehouses keeps new fill demand elevated as the statutory cap tightens—drawing down inventories by 2029 and pushing total demand above available supply by 2030. *See* OTS Analysis 2, 5–7 & fig. 4; Expanded HFC Data; *see also* EPA TSD 2023.

***v. Conclusion***

The AIM Act's framework works by aligning a declining supply of HFCs (Subpart A) with declining demand for those HFCs in new equipment (Subpart B). The Proposed Rule breaks that alignment by raising near-term new fill demand in three commercial refrigeration sectors as the cap tightens. Using EPA datasets and assumptions and working within EPA's stated ranges, the OTS Analysis shows inventories drawn down by 2029 and demand exceeding available supply around 2030 under the Proposed Rule, with higher modeled prices than under the current TT

Rule. Europe's 2017–2018 experience likewise demonstrates that failing to manage demand during quota reductions leads to sharp price increases.

To maintain an orderly transition and minimize price risk to consumers, EPA should retain the current TT dates (or, if any relief is granted, limit it narrowly in scope, volume, and duration).

### D. Reliance by AHRI and Alliance members on the TT framework means EPA must meet a higher legal standard before modifying core requirements

Given the industry's substantial reliance on the 2023 TT framework, EPA must meet a materially higher justification before revising compliance dates or GWP thresholds. Prevailing federal jurisprudence requires agencies changing policy to account for reliance interests and to offer a reasoned explanation commensurate with the disruption. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The U.S. Supreme Court has refused deference where a rule change undermined significant reliance interests without adequate explanation. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). *See also* 5 U.S.C. §§ 553(c), 706(2)(A).

The Proposed Rule acknowledges this standard, stating that an agency may revise a prior action only if it "acknowledges the change in position, provides a reasonable explanation for the new position, and considers legitimate reliance interests in the prior position." 90 Fed. Reg. at 48,001. The Proposed Rule also confirms EPA is aware of at least some of the costs of a change in requirements, reporting that EPA "received information indicating that relaxing restrictions in the retail food refrigeration (supermarkets and remote condensing units) subsectors would result in disbenefits for companies that have invested in alternative technologies." *Id*. at 48,015. EPA further acknowledges it "does not have all the information necessary to quantify the potential net cost savings." *Id*. at 48,015.

Such an accounting does not satisfy the Court's requirements to override significant reliance interests. Where an entire domestic industry has already retooled, certified new product platforms, and trained workforces to meet the existing dates, the Agency must grapple with those concrete reliance interests and explain, with record support, why any reversal is justified despite the acknowledged harm EPA's rule will inflict on the entirety of the U.S. HVACR industry. *See Fox*, 556 U.S. at 515; *Encino Motorcars*, 136 S. Ct. at 2126; 90 Fed. Reg. at 48,015. Absent such a reliance-aware explanation, deferring deadlines or weakening interim limits in high-volume commercial refrigeration subsectors would be arbitrary and capricious under 5 U.S.C. § 706(2)(A).

As discussed throughout these comments, EPA has not articulated a sufficient basis for overriding the substantial reliance interests at stake, particularly in light of Section 3's discussion of the ample availability of substitute refrigerants and virtually non-existent building code-related barriers.

## E. State activity underscores that weakening the federal TT Rule will invite more aggressive and fragmented regulation at the state level

The AIM Act does not preempt state HFC regulation. Weakening federal TT requirements with sector-wide delays would accelerate divergent state action, raising compliance complexity and costs for original equipment manufacturers, distributors, contractors, retailers, and consumers.

The U.S. Climate Alliance includes 24 governors whose states and territories account for roughly 55% of the U.S. population and about 60% of national GDP. *See* U.S. Climate Alliance, *2025 Annual Report: Pressing Forward: Governors' Enduring Fight for a Resilient & Sustainable Future* (2025). If TT requirements are rolled back, U.S. Climate Alliance states and territories can be expected to move faster on HFC controls and in different directions, creating a patchwork that erodes economies of scale and raises prices. While some states with durable Republican majorities may decline to regulate HFCs, they will be in the minority and their stance will add to, not resolve, the inconsistency of requirements across the national market.

In addition to New York, California, and Washington discussed below, the HVACR industry expects multiple other states to respond to any federal rollback with their own disparate and more aggressive HFC standards.

### *i.* New York

Amendments to 6 N.Y.C.R.R. pt. 494, finalized in 2024, impose GWP20 *(i.e.*, the 20 year GWP value and not the standard 100 year GWP value) limits as low as 10 and 20 across major HVACR sectors on accelerated timelines, including requirements for residential and light commercial AC/HP (GWP20 ≤ 10 by Jan. 1, 2034), VRF (GWP20 ≤ 10 by Jan. 1, 2030), and new refrigeration facilities (GWP20 ≤ 10 for systems under 200 pounds by Jan. 1, 2026). 6 N.Y.C.R.R. § 494-1.4(e)(2)(v), (vi), (e)(3)(xviii) (2025).

AHRI and HARDI have challenged these regulations in the Supreme Court of New York as arbitrary and in conflict with the federal framework. *See* Verified Petition and Complaint, *Heating, Air-Conditioning & Refrigeration Distributors Int'l (HARDI) & AHRI v. N.Y. State Dep't of Envtl. Conservation*, Index No. 903624-25 (Sup. Ct. Albany Cnty. filed Apr. 9, 2025); Petitioners-Plaintiffs' Reply Memorandum of Law (Aug. 28, 2025).

### *ii.* California

California Senate Bill 1206 directs the state to plan and regulate toward low- and ultra-low-GWP alternatives across sectors and to post an assessment specifying how to transition the economy to ultra-low or no-GWP alternatives no later than 2035. *See* Cal. S.B. 1206, ch. 884, §§ 2–3 (2022). Consistent with that mandate, a state white paper on pathways to ultra-low-GWP transitions is expected in the first quarter of 2026. The combination of a statutory transition mandate and

forthcoming implementation guidance positions California to tighten standards rapidly if federal requirements are weakened.

### *iii.* Washington

Washington's Second Substitute H.B. 1462 (2025) establishes a Refrigerant Transition Task Force to assess opportunities, barriers, and recommendations for transitioning to low- and ultra-low-GWP refrigerants by 2035, with appointments due by July 1, 2026, public review of a draft report in 2027, and a final report due December 1, 2027. This law also authorizes the Department of Ecology to initiate rulemaking informed by the task force's recommendations beginning January 1, 2028. *See* 2SHB 1462 (Wash. 2025).

## F. Conclusion

In closing this section, EPA should keep the current TT Rule's schedule intact and provide limited, targeted relief where needed until January 1, 2029. The AIM Act's allowance cap in Subpart A and the TT equipment limits in Subpart B move in tandem, aligning a declining supply with declining demand and giving manufacturers the certainty to invest, certify, and train. The Proposed Rule severs that alignment by increasing near-term demand while supply tightens. The record before the Agency shows the consequence: OTS's EPA-based modeling projects inventories drawn down by 2029 and demand exceeding supply around 2030, with higher prices than under the existing rule, as reflected in Figure 5.

Experience bears this out. Europe's 2017–2018 quota steps saw sharp price increases when demand was not managed as supply fell. The Proposed Rule effectively walks the United States into the same trap Europe fell into nearly a decade ago.

Moreover, a federal retreat would, in any event, fail to reduce the regulatory burden on U.S. manufacturers and businesses using cooling equipment, such as supermarkets. The AIM Act does not preempt state action. U.S. Climate Alliance jurisdictions, numbering 24 and accounting for roughly 55 percent of the population and about 60 percent of GDP, are positioned to move faster and divergently. New York has already adopted stringent GWP20 limits. California is preparing an ultra-low-GWP pathways white paper for early 2026. Washington will convene a task force to chart a similar course. Other states can be expected to follow. The result is a complex and costly patchwork, in part catalyzed by the Proposed Rule.

The prudent course is to maintain the existing dates, and, if adjustment is unavoidable, confine it to narrow, well-supported exceptions (*e.g.*, wine cellar coolers, milk coolers, or laboratory refrigeration equipment).

## 3. EPA'S SNAP LISTINGS AND BUILDING CODE UPDATES CONFIRM THAT SUBSTITUTES ARE AVAILABLE NOW, SO EPA NEED NOT RELAX DATES OR RAISE GWP LIMITS

### A. EPA's SNAP listings provide multiple acceptable alternatives for the affected retail-food end uses

EPA's recent Significant New Alternatives Policy (SNAP) rulemakings confirm that technically feasible, commercially deployable substitutes are available now for the retail-food refrigeration end uses at issue. In June 2024, EPA listed HFO-1234yf, HFO-1234ze(E), R-454C, R-455A, R-457A, and R-516A as acceptable (subject to use conditions) for new supermarket systems, retail food remote condensing units, and cold storage warehouses, and listed R-454A as acceptable for supermarket systems, retail food remote condensing units, and cold storage warehouses with charge and cascade-side limits (*e.g.*, charge <200 lb. or use on the high-temperature side of a cascade). These listings are paired with national safety conditions that incorporate UL 60335-2-89 (2d ed.) and ASHRAE 15-2022, addressing charge, detection, ventilation, labeling, and related controls in a uniform manner. *See* 89 Fed. Reg. 50,410, 50,415–20 (June 13, 2024) (SNAP 26) (listing acceptable substitutes for supermarket systems, remote condensing units, and cold storage warehouses).

Taken together, the SNAP determinations demonstrate multiple viable pathways across common retail-food architectures for the same end uses proposed for delay in the reconsideration notice. EPA's listings for these substitutes rest on comparative risk assessments under the SNAP framework and expressly condition use on the UL/ASHRAE standards referenced above, resolving safety and installation considerations that are sometimes cited as barriers. *See* 89 Fed. Reg. at 50,415–20. EPA's prior SNAP actions likewise explain the rationale for "acceptable-with-use-conditions" listings and how the UL/ASHRAE provisions function to assure safe deployment in the field. *See*, e.g., 88 Fed. Reg. 26,382, 26,386–94 (Apr. 28, 2023) (SNAP 25) (summarizing use-condition approach and safety incorporation); 86 Fed. Reg. 24,444, 24,447–51 (May 6, 2021) (SNAP 23) (background on end-use scoping and risk management).

Accordingly, the proposal does not identify record evidence demonstrating that substitutes are unavailable or impracticable within the relevant compliance horizon. Indeed, EPA's own SNAP rulemakings establish the contrary: multiple substitutes are listed for supermarket systems, retail food remote condensing units, and cold storage warehouses, with nationally harmonized safety provisions and defined use conditions already in place. On this availability record, broad changes to dates or interim GWP limits are not warranted.

### B. Building codes across virtually all jurisdictions allow A2L use; minor remaining updates will occur prior to remaining transition dates

EPA's proposed rule revisits claims that building code updates could impede the transition to next generation refrigerant technologies. The record demonstrates otherwise. Since 2021, nearly every U.S. jurisdiction has acted to authorize the use of mildly flammable (A2L) refrigerants through adoption of the 2024 model codes or interim measures consistent with those provisions.

Building codes govern the installation and safety requirements for HVACR systems and determine when alternative refrigerants may be used in the field. These codes include the International Mechanical Code (IMC), the International Residential Code (IRC), and the Uniform Mechanical Code (UMC), all of which now include explicit standards for A2L refrigerants consistent with UL 60335-2-40, UL 60335-2-89, and ASHRAE 15. The 2024 editions of the IMC and IRC expressly authorize A2L refrigerants for air-conditioning and heat-pump systems under defined charge limits and safety controls. The International Code Council has also published a free crosswalk identifying line-by-line modifications needed to align earlier code editions with the 2024 standards, which was a vital tool that has allowed states to implement interim measures even without adoption of the 2024 editions.

The update process has been rapid and nearly complete. Forty-nine states have formally recognized A2L use either through adoption of updated model codes, enactment of state legislation, or issuance of letters of approval by the state fire marshal or building authority. Twenty-nine states have passed legislation explicitly allowing alternative refrigerants, and several others, including Idaho, Kentucky, Michigan, Nevada, and the District of Columbia, have issued interpretive letters confirming that A2L products listed and labeled to UL standards and installed in accordance with ASHRAE 15 are permissible under existing codes. *See* AHRI, *A2L Refrigerants Building Code Map* (2025), at https://www.ahrinet.org/a2l-refrigerant-building-code-map-us (an online interactive map tracking building code updates on a jurisdiction-by-jurisdiction basis).

Only two states, Florida and Louisiana, are still completing their adoption processes. Florida's Ninth Edition Florida Building Code is scheduled for final approval in December 2025 and will take effect December 31, 2026. Louisiana has established a Code Review Committee to evaluate the 2024 model codes, with additional meetings scheduled through late 2025. In both cases, the remaining administrative steps are well within the normal code cycle and are not expected to prevent compliance with the current TT deadlines.

In the interim, jurisdictions that have not yet completed formal adoption can issue letters of approval or administrative interpretations confirming that equipment listed to (or installed in accordance with) the relevant UL and ASHRAE standards may be installed safely. This approach, already used in multiple states, provides a practical bridge while preserving local control of the code process.

In the proposed rule, EPA discusses the claim that "home rule" jurisdictions can block or delay the adoption of A2L refrigerants and thereby justify extended transition dates. This is based on an

argument that, in states where local governments have independent code authority, local resistance could prevent A2L implementation. 90 Fed. Reg. at 48005–07.

That concern is overstated and not supported by the record. "Home rule" is a state law allocation of authority between state and local governments; it does not mean localities can disregard state or model code provisions once those have been adopted. EPA's own discussion confirms that 49 states have taken action allowing A2L refrigerants and that, in home rule states, local jurisdictions have established processes for recognizing equipment that complies with UL 60335-2-40 and UL 60335-2-89 and is installed in accordance with ASHRAE 15 while local code updates proceed. 90 Fed. Reg. at 48006–07. The experience of AHRI and the Alliance shows that statewide adoption of the 2024 model codes or equivalent statutory authorization binds local jurisdictions in most home rule states, either through explicit preemption or administrative interpretation. Where local discretion remains, jurisdictions have consistently used approval letters and interim guidance to permit A2L installations.

As a result, the presence of "home rule" in a state does not create a factual or legal basis to claim that building codes prevent the A2L transition. EPA should recognize in the final rule that local authority in home rule states does not make statewide code adoption illusory or justify delay in the Technology Transitions schedule.

Accordingly, the record demonstrates that building codes are not a barrier to compliance with the TT Rule. The model codes governing HVACR safety and fire protection have been updated, adopted, and implemented in nearly all jurisdictions. Remaining state and territorial actions are routine and manageable through established administrative mechanisms. EPA should therefore affirm in the final rule that code readiness does not justify delay in the transition schedule.

*See* Int'l Code Council, *2024 Int'l Mechanical Code* §§ 1101.2.1, 1104.3.1 (2024); *2024 Int'l Fire Code* ch. 6; *Uniform Mechanical Code* § 1104 (2024).

## 4. THE PROPOSED RULE FAILS TO SATISFY § 7675(I)(4)(A)–(D) INTENDED BY CONGRESS TO GUIDE TECHNOLOGY TRANSITIONS RULEMAKINGS

### A. Introduction

Subsection (i)(4) of the AIM Act directs EPA, when conducting a rulemaking or deciding a petition under subsection (i), to consider, to the extent practicable, the best available data, the availability of substitutes, overall economic costs and environmental impacts, and the remaining phasedown period. 42 U.S.C. § 7675(i)(4)(A)–(D). These factors demonstrate Congress's intent that technology transition rules advance the AIM Act's objectives in a manner that is economically and environmentally rational and synchronized with the statutory production and consumption phasedown.

The Proposed Rule arises from both administrative reconsideration petitions and stakeholder requests. Although § 7675(i)(4) does not expressly reference reconsideration petitions or EPA-initiated revisions, EPA must evaluate and apply the § 7675(i)(4) factors to give effect to Congress's direction and to conform to sound administrative practice, thereby avoiding action that is arbitrary or capricious. 5 U.S.C. § 706(2)(A).

**B. 2023 Technology Transitions Rule**

In 2023, EPA promulgated the Technology Transitions final rule now codified at 40 C.F.R. pt. 84, subpt. B, and applied the four statutory factors in 42 U.S.C. § 7675(i)(4). The preamble and other analysis in the docket documented "best available data," evaluated the "availability of substitutes" with the statute's embedded sub-factors (technological achievability, safety, codes, and consumer cost considerations), quantified "overall economic costs and environmental impacts," and synchronized compliance dates with the AIM Act phasedown so that new-equipment demand aligned with declining allowances (including the statutory 2029 reduction to 30 percent of the baseline).

EPA's *Costs and Environmental Impacts Technical Support Document* confirms this alignment: Figure 4-1 charts annual avoided HFC consumption against the AIM Act cap and shows modeled abatement dipping below the cap from 2025 through 2036, demonstrating that the final rule's timing was designed to keep total consumption under statutory limits in each stepdown year, including 2029. *See* EPA TSD 2023 at 35–36 & fig. 4-1.

**C. 2025 Reconsideration Proposal**

EPA proposes revisions of the 2023 rule in response to administrative petitions and stakeholder requests, including deferrals and interim GWP thresholds for high-volume retail food sectors. The Proposed Rule invokes subsection (i) authority but states EPA "does not have sufficient information to quantify certain expected net cost savings," and in any event notes such savings would be "difficult to quantify with existing data" without reckoning with likely impacts on price by increasing demand while reducing supply. 90 Fed. Reg. at 48,015–16, 48,016 & tbl. 1. EPA further acknowledges it "received information indicating that relaxing restrictions in the retail food refrigeration (supermarkets and remote condensing units) subsectors would result in disbenefits for companies that have invested in alternative technologies." 90 Fed. Reg. at 48,015.

EPA's own analysis indicates the reconsideration could increase HFC consumption by about 37.5 $MMTCO_2e$ between 2025–2032 and about 62.8 $MMTCO_2e$ through 2050, with upper-bound uncertainty of about 91.1 $MMTCO_2e$ (2025–2032) and about 168.6 $MMTCO_2e$ (to 2050). Id. at 48,016. As noted above in Section 2.C, industry modeling using EPA datasets and similar assumptions projected a 64.5 $MMTCO_2e$ increase in demand from 2025-2032 if the proposed deferrals are finalized; markedly higher than EPA's base estimate but still well within the Agency's own margin of uncertainty.

### D. Conclusion

EPA's 2023 rule satisfied § 7675(i)(4)(A)–(D) by grounding decisions in quantified cost and environmental analysis and by synchronizing transitions with the AIM Act's remaining phasedown period. The Proposed Rule does not re-apply that framework to the proposed deferrals: it forgoes quantification of asserted cost savings, states that such savings are "difficult to quantify with existing data," projects increased HFC consumption, identifies disbenefits to early adopters, and omits a synchronization analysis showing consistency with the 2029 stepdown and the remaining phasedown period. *See* 90 Fed. Reg. at 48,015–16, 48,016 tbl. 1.

Given this record, including OTS's EPA-based modeling showing higher demand within EPA's own uncertainty range, EPA has not adequately analyzed or justified its proposed actions. The Proposed Rule's analysis, as a result, fails to apply the statutory criteria intended by Congress to guide rulemakings under this subsection (i) of the AIM Act.

## 5. IF EPA GRANTS ANY RELIEF, IT SHOULD BE NARROW, TIME-LIMITED, AND MINIMAL RATHER THAN BROAD SECTOR-WIDE DELAYS

Targeted relief may be justified where a discrete application faces a documented constraint, but only if narrowly drawn and time-limited so that the volume involved does not disturb the supply-demand balance underlying 2029 planning. Where a discrete sub-category faces such a constraint, AHRI and the Alliance support narrow, time-limited relief in lieu of sector-wide deferrals.

Any such relief should default to a sunset no later than January 1, 2029. Further, scale matters: large, high-volume classes (*e.g.*, supermarket systems) should not receive sector-wide carve-outs on the same footing as niche, low-volume configurations (e.g., certain laboratory or process-cooling applications).

Consistent with this position, EPA should use this reconsideration to fine-tune the provision of relief as follows:

- *Eligibility and record basis.* Limit relief to sub-categories with clear, docketed evidence of near-term constraints (*e.g.*, safety standard/certification timing for a defined configuration or project class). Relief should exclude cases where compliant alternatives are commercially available or deployable within ordinary project cycles and must quantify expected volumes to confirm no disturbance to 2029 planning.

- *Form of relief.* Prefer targeted installation flexibility (*e.g.*, a narrowly drawn carve-out for a specific configuration or capacity class) because interim GWP ceilings expand eligibility across broad classes and elevate aggregate new fill demand.

- *Minimal volume and* duration. If any relief extends beyond January 1, 2029, strictly limit volume and duration to avoid perturbing the supply–demand balance.

- *Streamlined implementation.* Administer any pre-2029 relief via a simple advance notice mechanism and standardized post-implementation reporting (*e.g.*, through EPA's existing electronic platform) so users can confirm eligibility before use and EPA can monitor volumes and end-uses in real time.

- *Sunset and verification.* Review post-implementation reporting on quantity and end-use to confirm the carve-out remains within represented volumes and does not spill over into adjacent product classes. If reported volumes exceed the specified threshold, terminate the relief automatically.

- *No back-door expansions.* Relief should not authorize higher-GWP "interim" options for broad classes (*e.g.*, all supermarket systems or all remote condensing units). Nor should it be used to justify statewide or national interim limits that would elevate demand into the 2029 stepdown and beyond.

AHRI and the Alliance wish to underscore that EPA should, in crafting criteria for providing targeted relief, EPA's implementation of such criteria do not result in the overly broad application of relief such that it does not misalign supply and demand to an extend where it would negatively impact the affordability of refrigerants, particularly in later stages of the phasedown.

## 6. AHRI AND ALLIANCE ISSUE-BY-ISSUE RESPONSES AND REQUESTS REGARDING EPA'S PROPOSED CHANGES

### A. Introduction

In this section, AHRI and the Alliance address the changes in the Proposed Rule on which it is taking a specific position. Each subsection below summarizes the relevant proposal, AHRI and the Alliance's position, and the supporting rationale. In some cases, AHRI and the Alliance make requests for clarification or for different requirements in the final rule. AHRI and the Alliance's comments are grounded in the statutory framework of the AIM Act, and the record established through EPA's prior TT rulemakings. Consistent with the Administrative Procedure Act, 5 U.S.C. § 553, AHRI and the Alliance provide these comments to ensure a reasoned and evidence-based final rule that preserves market stability, protects consumer interests, and aligns with the statutory phasedown of HFCs.

### B. Supermarket systems should remain subject to the existing 150/300 thresholds effective January 1, 2027

#### *i. EPA Proposal*

EPA proposes to establish an interim 1,400 GWP limit for supermarket systems beginning January 1, 2027, with a reversion to the 150/300 GWP thresholds on January 1, 2032. 90 Fed. Reg. at 48,007.

### *ii. AHRI-Alliance Position: Opposed*

AHRI and the Alliance respectfully oppose the proposed interim 1,400 GWP ceiling and the associated delay. EPA should maintain the existing 150/300 thresholds effective January 1, 2027, as finalized in 2023. The current schedule is aligned with the AIM Act's 2029 supply stepdown, reflects available technology and code readiness, and preserves the regulatory certainty that has catalyzed substantial investment and product certification. As explained in Section 3, broad date and GWP relaxations would misalign demand with the statutory supply cap and elevate costs across the market; if the Agency identifies discrete constraints, relief should be targeted, time-limited, and minimal volume, as supermarket systems represent a very large market, materially different from niche end uses, in which companies have spent multiple years preparing for the 2027 transition.

### *iii. Statutory alignment and the purpose of TT*

The AIM Act's phasedown requires HFC consumption to reach 30% of baseline in 2029. 42 U.S.C. § 7675(e)(2)(B)-(C). EPA's TT Rule is expressly designed to "facilitat[e] the transition to next generation technologies by restricting use of HFCs in the sectors or subsectors in which they are used," thereby aligning demand with the statutory cap. 87 Fed. Reg. 76,740 (Dec. 15, 2022) (TT Proposed Rule). Substituting a sector-wide 1,400 interim ceiling for supermarket systems would extend high-GWP installations into the 2029 stepdown and upset that alignment. *See* also Section 3 (discussing demand-supply synchronization under the TT rule).

### *iv. Reliance and regulatory certainty*

The 2023 final rule created stable, knowable milestones that underwrote multi-year retooling, certification, and workforce training programs. *See* Section 3 (industry investment, shipments, and employment trends). Reversing course now would strand sunk costs, duplicate product lines, and inject compliance uncertainty. Under the APA, the Agency must "examine the relevant data and articulate a satisfactory explanation" for changing policy, including a reasoned treatment of reliance interests. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). The record presented in this reconsideration does not demonstrate a sector-wide necessity that outweighs those settled interests.

### *v. Technology and codes are available at scale*

As detailed in Section 3, compliant substitutes are in the market and national codes have been updated to accommodate next generation refrigerant technologies under appropriate safety

provisions. In the absence of contrary record evidence, a broad interim ceiling is not "necessary" to address supermarket systems; any residual concerns can be addressed through targeted measures.

### *vi. Market and consumer price risk*

As discussed more fully above, delaying a transition date and raising GWP limits for any one sector past January 1, 2029, is likely to raise refrigerant prices for every sector. Briefly stated, when demand for legacy service remains inelastic and supply tightens, sector-wide delays transmit higher prices across the market. *See* OTS Analysis (modeling demand-supply balance under current versus delayed transitions); Expanded HFC Data (baseline and consumption data). The risk only increases as supermarket installations remain on higher-GWP pathways beyond 2029. Supermarket systems are a high-volume class, so sector-wide deferral magnifies this cross-market risk.

### *vii. APA considerations and lawful tailoring*

To the extent EPA seeks to address discrete constraints, the Agency should adopt narrow, time-limited adjustments supported by docketed evidence and bounded volumes that do not perturb the 2029 supply-demand balance. A sector-wide 1,400 GWP ceiling is not the least-disruptive means and would be arbitrary where narrower tools suffice. *See generally Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43–44 (agency must consider reasonable alternatives).

## C. Retail food remote condensing units should remain subject to the existing 150/300 thresholds effective January 1, 2026, but with limited, time-bound relief for discrete sub-categories until January 1, 2029

### *i. EPA Proposal*

EPA proposes to establish an interim 1,400 GWP limit for retail food refrigeration remote condensing units beginning January 1, 2026, reverting to the 150/300 GWP thresholds on January 1, 2032. 90 Fed. Reg. at 48,001.

### *ii. AHRI-Alliance Position: Opposed*

AHRI and the Alliance oppose the proposed interim 1,400 GWP ceiling and any delay in the current compliance schedule for retail food remote condensing units. EPA should retain the existing 150/300 thresholds and the January 1, 2026 effective date, which are consistent with the AIM Act's statutory phasedown and with available technology and safety standards.

However, AHRI and the Alliance support targeted, time-limited relief for discrete sub-categories with documented technological or certification constraints, provided that such relief is limited in volume, sunsets no later than January 1, 2029, and does not disturb the overall market balance.

### *iii. Rationale*

EPA's reconsideration proposal does not provide evidence that would justify a sector-wide delay for retail food remote condensing units. Multiple lower-GWP refrigerant substitutes, such as R-454A, R-454C, R-455A, and R-516A, are already listed as acceptable for this end use under SNAP. *See* 89 Fed. Reg. at 50,415–20. These listings confirm that compliant substitutes are commercially available and deployable for retail food remote condensing units operating across typical charge sizes and temperature ranges.

EPA has also incorporated uniform safety and use-condition requirements under the TT Rule to ensure safe and orderly installation of equipment using A2L refrigerants. The Agency has therefore already satisfied its obligation to consider technical feasibility and public safety. As AHRI and the Alliance have explained elsewhere, any delay that prolongs high-GWP refrigerant use into the 2029 phasedown step would misalign supply and demand, raising costs for all users rather than alleviating any true constraint. *See* Section 3(c) (discussing misalignment and market-wide price impacts).

The record instead supports the use of targeted, limited relief rather than broad amendments. AHRI and Alliance member manufacturers identified a small number of specialty applications that may face transient certification or component-availability challenges. Relief for these sub-categories should be explicitly limited by equipment type, volume, and date to prevent expansion beyond what is strictly necessary.

### *iv. Remote Condensing Unit Subsectors Potentially Needing Targeted Relief*

In the final rule, EPA should provide narrow, time-limited relief in a remote condensing unit subsector in need of additional time to complete the transition to a substitute refrigerant until January 1, 2029 (*e.g.*, wine cellar coolers, milk coolers, or laboratory refrigeration equipment). This would allow the Agency to respond to concerns in a targeted manner that does not unduly impact other sectors or subsectors, which is likely to be the case with an overly broad sector-wide delay in the transition date and an upward adjustment in GWP limit.

Examples of possible barriers include (a) recertification testing timing at labs for specific capacity classes and cabinet/coil configurations, and (b) component availability issues in low-temperature applications (as distinct from medium-temperature applications) for retail food remote condensing units and warehouse settings. In addition, extreme ambient conditions in cold-climate or hot-climate regions may require additional performance and safety testing to confirm stable operation across the full temperature envelope, which can extend certification timelines.

Such targeted flexibility for remote condensing unit subsectors would be a logical outgrowth of the proposal, as EPA expressly noticed its intent to revisit both the transition dates and GWP

thresholds for retail food remote condensing units and solicited comment on the scope, structure, and implementation of those adjustments. Finalizing more limited, case-specific means to provide relief in the final rule falls within the same subject matter as the proposal, represents a narrower variant of the approaches already presented for public comment, and is therefore reasonably foreseeable based on the contents of the proposal. *See* 90 Fed. Reg. at 47,999, 48,006.

AHRI and the Alliance have identified several remote condensing unit subsectors that may warrant targeted relief, including high-suction-temperature applications (*e.g.*, milk coolers and wine cellar coolers) and very-low-suction-temperature applications (*e.g.*, specialty laboratory equipment, which is distinct from the refrigerated centrifuges and laboratory shakers for which EPA proposed an exemption; this type of specialty laboratory equipment involves refrigeration applications using remote condensing units).

#### *v. Request for Clarification*

AHRI and the Alliance respectfully request that EPA clarify that "remote condensing unit" refers to the equipment type as manufactured, not the end-use location, and should delineate the functional boundary between the remote condensing unit and cold storage warehouse categories. This clarification will prevent overlap where retail food condensing units serve small walk-in or process-cooling rooms, ensure non-duplicative, non-conflicting treatment across retail-food applications, and maintain regulatory certainty for interchangeable equipment.

If EPA cannot draw that boundary in this action, and the Alliance respectfully request the Agency harmonize requirements to the extent practicable for equipment used interchangeably across retail refrigeration and cold storage end uses.

### D. Installation of residential and light commercial air-conditioning and heat-pump systems using pre-2025 components should be allowed indefinitely

#### *i. EPA Proposal*

EPA proposes to remove the January 1, 2026, installation cutoff for residential and light commercial air-conditioning (AC) and heat-pump (HP) systems assembled from components manufactured or imported before January 1, 2025. 90 Fed. Reg. at 48,004. The change would allow installation of complete systems using pre-transition components after that date without limitation.

#### *ii. AHRI-Alliance Position: Support*

AHRI and the Alliance support EPA's proposed indefinite installation allowance for systems assembled from components manufactured or imported before January 1, 2025. This approach builds directly on EPA's *Interim Final Rule, Phasedown of Hydrofluorocarbons: Technology Transitions Program—Residential and Light Commercial Air Conditioning and Heat Pump*

*Subsector*, 88 Fed. Reg. 88,825 (Dec. 26, 2023) (TT Final Rule or TT Rule), which extended the installation period for pre-2025 components by one year to avoid the economic and environmental harm of stranded inventory.

***iii. Rationale***

EPA's interim final rule for this subsector already found that a one-year installation reprieve for pre-2025 components was needed to avoid stranded inventory and would have negligible environmental impact because it applies only to a fixed stock of parts manufactured before the compliance date. *See* 88 Fed. Reg. at 88,825, 88,827–31.

Extending that allowance indefinitely for the same pre-2025 components follows the same logic: once manufacturing and import cease, the eligible inventory cannot grow and will be drawn down over time, so an open-ended installation window does not increase the number of higher-GWP systems beyond what EPA already modeled; it simply governs the timing of installing that finite stock.

**E. Variable refrigerant flow (VRF) systems should receive an indefinite installation allowance for pre-2026 components, consistent with AC/HP treatment**

***i. EPA Proposal***

EPA proposes to remove the January 1, 2026, installation cutoff for residential and light commercial AC/HP systems assembled from components manufactured or imported before January 1, 2025, but does not extend the same installation flexibility to VRF systems. *See* 90 Fed. Reg. at 48,004. VRF installation timing remains governed by a separate action allowing installation of systems assembled from pre-2026 components through January 1, 2027, (and through January 1, 2028, for certain permit-qualified projects). *See* 89 Fed. Reg. 100,381, 100,382–84 (Dec. 12, 2024).

***ii. AHRI-Alliance Position: Additional Request***

AHRI and the Alliance respectfully request indefinite installation for VRF systems assembled entirely from components manufactured or imported before January 1, 2026, in parity with the proposed indefinite allowance for AC/HP systems assembled from pre-2025 components. This alignment maintains manufacturer-date-based compliance, prevents stranded lawful inventory, and obviates the need for the permit-based VRF extension, without increasing overall HFC consumption because eligible VRF components constitute a finite stock.

***iii. Rationale***

EPA has already recognized in the AC/HP context that installation flexibility tied to pre-transition manufacture/import dates prevents stranded inventory and has negligible

environmental impact because it applies only to a fixed, declining pool of components. The same facts apply to VRF: manufacturers and distributors hold limited quantities of pre-2026 specified components that cannot feasibly be repurposed once produced. Allowing indefinite installation for systems assembled solely from these components does not expand the number of higher-GWP systems beyond what EPA has already modeled; it solely governs timing of installation as that inventory is drawn down.

A single, indefinite allowance for pre-transition VRF components also simplifies administration and promotes national consistency. It removes the complexity of a permit-based carve-out and aligns VRF with the manufacturer-date structure that underpins the TT program and longstanding EPA and DOE practice. In short, extending the AC/HP approach to VRF is the most coherent, minimally burdensome way to avoid waste and preserve regulatory certainty while keeping the AIM Act's 2029 trajectory intact.

A parallel, indefinite allowance for VRF is also a logical outgrowth of the notice. In this rulemaking, EPA proposed installation flexibility for AC/HP systems by removing the post-2025 installation cutoff for systems built from pre-transition components, and sought comment on the scope and implementation of that adjustment. *See* 90 Fed. Reg. at 48,004. Applying the same, manufacturer-date-based installation mechanism to the closely related VRF subsector, which is already subject to a distinct installation-timing rule grounded in the same inventory-management rationale, falls within the same subject matter, represents a narrower variant of the approaches noticed, and was reasonably foreseeable in light of EPA's existing VRF requirements. Because both air conditioning and heat pump systems and VRF systems are governed by the same subsection (i) framework and rely on identical "specified component" concepts, applying a uniform manufacturer-date rule is a foreseeable variant of the noticed approach. *See* 89 Fed. Reg. at 100,381, 100,382–84.

Given this prior recognition by EPA to AC/HP systems, stakeholders reasonably should have anticipated application of the same treatment to VRF systems assembled from pre-2026 components. *See AFL-CIO v. Marshall*, 617 F.2d 636, 649–51 (D.C. Cir. 1979); *Owner-Operator Indep. Drivers Ass'n, Inc. v. FMCSA*, 494 F.3d 188, 202–03 (D.C. Cir. 2007); *Chocolate Mfrs. Ass'n v. Block*, 755 F.2d 1098, 1104–05 (D.C. Cir. 1985).

If EPA concludes this change is not a logical outgrowth, the Agency should promptly issue a supplemental notice of proposed rulemaking to adopt the same manufacturer-date installation treatment for VRF, with an expedited but reasonable comment period and swift finalization. In the interim, EPA should state its intent to do so and consider appropriate transitional guidance to avoid unnecessary disruption pending completion of that follow-on action.

### F. EPA should allow the indefinite use of pre-compliance date components for the installation of new commercial and industrial refrigeration and ice-making systems

#### *i. Request*

EPA should extend the indefinite installation allowance approach adopted for residential and light commercial AC/HP systems to the commercial and industrial refrigeration and ice-making sectors and subsectors. As with AC/HP and VRF equipment, components manufactured or imported before the applicable compliance date constitute a finite, declining stock that cannot expand after production ends. Allowing these components to be installed in new systems after the compliance date would not increase total HFC consumption or alter the 2029 phasedown trajectory; it would simply govern the timing of use for existing lawful inventory.

#### *ii. Legal and Policy Basis*

This treatment is a logical outgrowth of EPA's proposal, as discussed in the prior subsection regarding VRF systems. Under the APA, a final rule qualifies as a logical outgrowth when it is "in character with the original scheme" and "reasonably foreseeable in light of the notice and comments." *Chocolate Mfrs. Ass'n v. Block*, 755 F.2d 1098, 1104–05 (4th Cir. 1985); *Owner-Operator Indep. Drivers Ass'n, Inc. v. FMCSA*, 494 F.3d 188, 209–10 (D.C. Cir. 2007); *see also AFL-CIO v. Marshall*, 617 F.2d 636, 655–56 (D.C. Cir. 1979). The Agency expressly proposed to remove the installation cutoff for AC/HP systems using pre-transition components, invited comment on the form and scope of that adjustment, and described its rationale—to avoid economic waste and stranded inventory while maintaining alignment with the AIM Act. See 90 Fed. Reg. at 48,004; see also 88 Fed. Reg. at 88,825, 88,827–31; 89 Fed. Reg. at 100,381. Extending the same manufacturer-date-based logic to other refrigeration sectors falls within the same subject matter, is "in character with the original scheme," and represents a consistent, reasonably foreseeable variant of the approach already noticed. *Chocolate Mfrs*., 755 F.2d at 1104–05; *Owner-Operator*, 494 F.3d at 209–10.

If EPA concludes that extending the indefinite installation allowance to the refrigeration and ice-making sectors is not a logical outgrowth of this rulemaking, it should promptly issue a supplemental proposal to adopt the same manufacturer-date-based approach for those sectors. In the interim, EPA should make clear its intent to pursue this action and consider temporary compliance guidance to prevent unnecessary disruption or stranded inventory pending completion of that follow-on rule.

#### *iii. Implementation and Effect*

A single, indefinite installation rule for pre-compliance date components would prevent unnecessary scrappage, reduce dual-inventory burdens, and promote consistency across equipment classes that share similar supply chains and installation practices. It would also align with industry's long-standing manufacturer-date compliance model, simplify enforcement, and maintain the cost-predictable structure Congress intended under the AIM Act. EPA should therefore allow components manufactured or imported before each sector's compliance date to

be used indefinitely in new system installations across the commercial refrigeration, industrial refrigeration, and ice-making subsectors, consistent with the AC/HP and VRF precedent.

## G. Intermodal containers, semiconductor manufacturing, laboratory equipment, and labeling correction should be finalized as proposed

### *i. EPA Proposal*

EPA proposes several discrete amendments to the TT Rule: (1) for intermodal containers, raising the applicability threshold to –35 °C, limiting restrictions to refrigerants with a GWP ≥ 700; (2) for semiconductor manufacturing, extending the compliance deadline for small-charge Industrial Process Refrigeration (IPR) and IPR Chiller equipment to January 1, 2030; (3) for laboratory equipment, extending compliance to January 1, 2028 for refrigerated centrifuges and laboratory shakers; and (4) correcting a cross-reference in § 84.58(b) without changing substantive obligations. *See* 90 Fed. Reg. at 48,010–13.

### *ii. AHRI-Alliance Position: Support*

AHRI and the Alliance support each of these amendments as proposed. They are narrowly tailored, technically justified, and administratively sound. They address specific implementation and timing issues within distinct subsectors while maintaining full alignment with the AIM Act's statutory phasedown schedule.

### *iii. Rationale*

Each proposed amendment corrects or refines existing provisions without expanding or delaying the TT framework. The intermodal container revision properly differentiates low-temperature transport refrigeration. The semiconductor manufacturing extension accounts for long qualification cycles and complex supply-chain integration unique to that industry. The laboratory equipment adjustment acknowledges reasonable lead times for engineering and safety certification of small, specialized devices. Finally, the § 84.58(b) correction provides regulatory clarity with no new obligations.

## H. Adopt a narrow, data-supported capacity threshold so routine supermarket remodels do not constitute new installations under § 84.54(e)

### *i. EPA Proposal*

EPA did not propose to amend § 84.54(e) but requested comment on whether a limited expansion of cooling capacity (*e.g.*, 25%) during a supermarket remodel or re-layout should be allowed without triggering the installation provisions in § 84.54(e)(2)-(3), and asked for data on an appropriate threshold. *See* 90 Fed. Reg. at 48006–08.

### *ii. AHRI-Alliance Position: Support Modest Change*

AHRI and the Alliance support EPA's clarification effort and recommends codifying an explicit tolerance for modest cooling-capacity increases during routine supermarket refreshes or layout adjustments, *e.g.*, up to ~25%, while retaining existing § 84.54(e) triggers for major expansions. A percentage lower than 25% (*i.e.*, 15%) is generally more appropriate for the Agency's stated purpose of distinguishing routine servicing from new installations that are part of major remodels. The tolerance should apply where the same refrigerant is used and no new compressor racks or condensers are added. This preserves the TT Rule's purpose (preventing circumvention of transition dates) and avoids unnecessary scrappage. If EPA concludes regulatory text is unnecessary, a clear interpretive guidance achieving the same result would suffice; if text is needed, this is a logical outgrowth of the proposal.

### *iii. Rationale*

Section 84.54(e)(2) was intended to capture significant rebuilds, not small capacity adjustments typical of store refreshes. Minor increases that do not expand refrigerant use or alter system architecture should not force a new-installation determination. A defined threshold resolves ambiguity, reduces unintended compliance burdens, and maintains alignment with the AIM Act's phasedown trajectory.

### *iv. Clarification Requested Regarding Retrofits and Potential Circumvention*

AHRI and the Alliance respectfully request EPA confirm in the final rule that the installation triggers in § 84.54(e), including subparagraphs (2) (increase in cooling capacity) and (3) (component-replacement thresholds), do not apply to retrofits as defined in § 84.52 and 42 U.S.C. § 7675(i)(7)(A). The statute and regulation define a retrofit as upgrading existing equipment where the regulated substance is changed, including conversions to achieve system compatibility and associated component changes. By contrast, § 84.54(e) would appear to govern modifications that retain the same refrigerant and determine when such work constitutes installation of a new system.

The AIM Act also provides that rules under subsection (i) shall not apply to equipment in existence before December 27, 2020, except for a retrofit application. 42 U.S.C. § 7675(i)(7)(B)(ii). AHRI and the Alliance read this clause as permissive rather than mandatory: it preserves EPA's authority to regulate retrofits, but it does not compel EPA to do so in every rulemaking. EPA has exercised that discretion by applying the Technology Transitions program to new products and new system installations and by stating in this reconsideration that "neither the GWP limits nor the provisions at 40 CFR 84.54(e) … currently apply to a retrofit." 90 Fed. Reg. at 48,009. EPA took the same approach in promulgating the 2023 Technology Transitions rule, which focuses the subsection (i) restrictions on new manufacture, import, and installation rather than retrofit activities.

In providing the requested clarification, AHRI and the Alliance further ask EPA to evaluate whether the retrofit pathway could be used to avoid § 84.54(e) and extend the use of higher-GWP refrigerants through iterative refrigerant changes. Such a practice could place undue pressure on allowance-constrained supply in 2029 and later years and risk misalignment between supply and projected demand. AHRI and the Alliance therefore request that EPA assess this potential for circumvention and, as part of the final clarification, state how the Agency will address any such concern so that the retrofit definition does not become a means to skirt new installation requirements or undermine the market alignment objective of subsection (i).

## I. Effective date interpretation under AIM Act § 103(i)(6) should distinguish between removals and relaxations while ensuring continuity for sectors awaiting targeted relief

### *i. EPA Proposal*

EPA proposes to interpret the AIM Act's effective-date provision, § 103(i)(6), to allow 30 days for rules that relax or remove existing requirements and to require a one-year delay for rules that establish new or stricter restrictions. *See* 90 Fed. Reg. at 48,014.

### *ii. AHRI-Alliance Position: Support in Part and Oppose in Part*

AHRI and the Alliance agree that a full removal of a restriction, where EPA eliminates an existing prohibition or limit in its entirety, may lawfully take effect within 30 days. However, AHRI and the Alliance oppose applying a 30-day effective date to rules that merely relax or modify restrictions on a graduated schedule.

### *iii. Rationale*

The plain text of the statute provides that "[n]o rule under this subsection may take effect before the date that is 1 year after the date on which the Administrator promulgates the applicable rule under this subsection," 42 U.S.C. § 7675(i)(6). This necessarily encompasses any rule that "restricts, fully, partially, or on a graduated schedule" the use of a regulated substance, id. § 7675(i)(1). A rule that modifies or eases an existing restriction remains, in legal character, a rule restricting use, and therefore must observe the one-year delay.

Congress expressly required a minimum one-year delay between promulgation and the effective date of any such restriction to ensure stability, transparency, and predictability for regulated entities. Removal of a requirement does not restrict "fully, partially, or on a graduated schedule" and no longer imposes a "rule under this subsection," and thus may take effect within 30 days. By contrast, a rule that modifies compliance dates, limits, or GWP thresholds remains a graduated-use restriction subject to the one-year delay. Applying a 30-day effective date to such partial relaxations would contravene the statute's plain text and invite inconsistency in implementation across sectors.

Moreover, as explained in Section 2 (market alignment and supply risk), indiscriminate acceleration or delay of restrictions can distort the refrigerant market and impede alignment with the 2029 phasedown cap. Preserving the one-year delay for all rules that continue to regulate use ensures an orderly transition, giving manufacturers, distributors, and contractors adequate time to adjust production, certification, and inventory management.

#### *iv. Enforcement Guidance Request*

Given the likelihood that the final rule will not be effective by January 1, 2026, AHRI and the Alliance urge EPA to issue temporary enforcement guidance to ensure continuity for subsectors awaiting limited, targeted relief. Several of the requirements EPA now proposes to modify take effect on that date; and, as explained above, any final action adjusting those requirements will itself be subject to the one-year delay in 42 U.S.C. § 7675(i)(6). Without interim guidance, regulated entities could face conflicting obligations during the intervening period.

EPA has used short-term enforcement discretion in comparable timing gaps to preserve orderly implementation while a rulemaking or program revision is completed. *See* U.S. Envt'l Prot. Agency, No Action Assurance—PSD and Title V Permitting Following *Utility Air Regulatory Group v. EPA* (Dec. 2014). A narrowly tailored, time-limited statement that EPA does not intend to pursue enforcement against entities acting in good faith and consistent with the proposed framework would prevent unnecessary disruption, align with established Agency practice, and uphold the integrity of the phasedown program while EPA completes the rulemaking.

## 7. ADVANCE COMMENT REQUEST ON R-454B AVAILABILITY

### A. EPA Proposal

EPA seeks advance comment on potential actions to address R-454B supply issues, including: price caps or anti-price-gouging measures; potential obligations on manufacturers to supply refrigerant for installation; Pipeline and Hazardous Materials Safety Administration (PHMSA) cylinder rules and options to increase U.S. cylinder production; measures to expand reclamation of R-454B and interactions with patent protections; compulsory licensing to enable additional blending or supply; and supporting data on feasibility, legal authority, timelines, costs, market impacts, reliance interests, and methods. The Proposed Rule also summarizes current market conditions (*e.g.*, contractor-level shortages tied to 20-lb A2L-rated cylinders, OEM repackaging of bulk product, and cylinder production ramp-ups).

### B. AHRI-Alliance Response

#### *i. OEM Responses to Temporary Supply Disruptions*

Earlier in 2025, some contractors reported localized tightness in R-454B and limited availability of certain A2L-rated cylinders. As manufacturers, AHRI and Alliance members monitor these

conditions and, when they arise, seek to minimize hardship to contractors and customers through practical, responsive actions. These can include coordinating with distributors to redirect inventory to service-critical installations, communicating expected lead times through wholesale channels, employing supplemental packaging capacity where feasible, prioritizing warranty and like-for-like replacement needs, supporting recovery and proper handling to reduce avoidable field losses, repackaging bulk product into 20-lb cylinders, increasing equipment charge where appropriate, and supporting cylinder production ramp-ups by qualified suppliers. See, e.g., 90 Fed. Reg. at 48,021–22.

Notwithstanding concerns over R-454B availability earlier this year, the broader market for air-conditioning and heat-pump systems, which had a January 1, 2025 transition date, indicates these tight conditions were not systemic. As noted above, according to HARDI's Unitary Market Intelligence Project (2025), by the third quarter of 2025 the residential and light commercial market had largely migrated to next generation refrigerants, with nearly 90 percent of equipment shipped with A2L substitutes, demonstrating supply at scale and broad commercial readiness.

### *ii. Advance Comment Request Responses*

With regard to EPA's request for advance comment, AHRI and the Alliance generally support EPA's information gathering on R-454B availability and pricing and recommends a focused, non-intrusive approach that preserves market signals and alignment with the AIM Act phasedown:

- *Do not adopt market-control measures.* Price caps, compulsory licensing, or supply mandates would distort investment, disrupt contracting and patent arrangements, and risk depressing near-term supply without addressing the actual bottlenecks. These measures would distort investment incentives, depress supply responses, and misalign the transition with the AIM Act phasedown.

- *Prioritize transparency and practical access.* EPA should encourage voluntary, time-limited reporting that improves field visibility into where product is available and in what quantities (*e.g.*, contractor-facing indicators such as order-fulfillment rates, typical delivery lead times for A2L-rated cylinders, and regional retail availability).

- *Coordinate on cylinders and logistics, not prices.* EPA should work with PHMSA to provide clear, harmonized guidance on A2L cylinder specifications, testing/recertification intervals, storage/handling, and labeling, and to facilitate qualification of additional domestic cylinder capacity where appropriate. Clarifying the logistics chain and cylinder handling standards will reduce frictions at the point of installation without distorting the market.

- *Maintain a stable upstream framework.* The AIM Act's allowance allocation program remains the principal mechanism for balancing supply and cost during the transition. EPA

should reaffirm predictability in Subpart A implementation and avoid ad hoc adjustments that would unsettle planning or misalign demand with the statutory phasedown.

- *Solicit targeted data before acting.* If EPA contemplates any further action, it should first solicit narrowly tailored data: (a) regional A2L-cylinder availability and fill-rate/lead-time metrics; (b) fulfillment and cancellation rates for contractor orders; (c) OEM practices that reduce field-charge needs on new installations; (d) current and projected domestic cylinder output and qualification timelines; and (e) quantified reliance interests and distributional effects associated with any contemplated intervention.

In sum, EPA should use the advance comment process to improve transparency, coordinate on cylinders and logistics, and maintain upstream predictability while avoiding market-control measures that would undermine supply incentives. This approach will address practical field constraints without disturbing the statutory phasedown or creating new cost pressures.

## 8. CONCLUSION

EPA should retain the existing TT Rule transition dates and GWP thresholds to preserve alignment with the AIM Act's 2029 supply stepdown, protect existing investments, and avoid price and supply disruption.

Where discrete constraints exist, EPA should adopt targeted, time-limited relief rather than sector-wide changes that would misalign demand with the statutory cap and invite state-level patchworks of divergent, more stringent mandates.

AHRI and the Alliance support the indefinite installation allowance for AC/HP systems assembled from pre-2025 components and requests parallel indefinite installation for VRF systems and for commercial and industrial refrigeration and ice-making systems to prevent stranded lawful inventory and maintain the uniform, manufacturer-date-based compliance framework.

AHRI and the Alliance respectfully request the same treatment be extended to pre-compliance date components used in new installations for commercial and industrial refrigeration and ice-making sectors and subsectors as well, on the same grounds.

***

On behalf of AHRI and the Alliance member companies, thank you for the opportunity to comment on this proposal. Please do not hesitate to contact me if I can answer any questions or provide any additional information.

Sincerely,

Stephen R. Yurek
President & CEO
AHRI
2311 Wilson Blvd, Suite 400
Arlington, VA 22201
syurek@ahrinet.org

Kevin Fay
Executive Director
The Alliance
2111 Wilson Blvd., 8th Floor
Arlington, VA 22201
fay@alcalde-fay.com

**LIST OF ATTACHMENTS**

European Commission, *Evaluation & Impact Assessment for Amending Regulation (EU) No 517/2014 (F-gas)*, *Briefing Paper* (May 6, 2021).

Inforum, *HVACR Manufacturing: Economic Trends and Insights* (Sept. 16, 2025).

Öko-Recherche & CITEPA, *Briefing Paper: HFC Availability on the EU Market* (Mar. 2020).

OTS R&D, Inc., *AIM Act Technology Transitions Refrigerant Modeling Scenarios* (Nov. 2025).